Slip Op. 01 - 37

UNITED STATES COURT OF INTERNATIONAL TRADE

- - - - - - - - - - - - - - - - - - - - x
NEENAH FOUNDRY CO.; ALHAMBRA FOUNDRY
INC.; ALLEGHENY FOUNDRY CO.; DEETER    :
FOUNDRY INC.; EAST JORDAN IRON WORKS,
INC.; LEBARON FOUNDRY INC.; MUNICIPAL :
CASTINGS, INC.; and U.S. FOUNDRY &
MANUFACTURING CO.,                     :

                        Plaintiffs,  : Court No. 99-07-00441

             v.                      :

THE UNITED STATES,                   :

                        Defendant.   :
- - - - - - - - - - - - - - - - - - - - x

Opinion & Order

[Plaintiffs' motion for judgment on
 the agency record granted in part;
 remanded to the International Trade
 Administration.]


                              Decided:  April 2, 2001


     Collier Shannon Scott, PLLC (Paul C. Rosenthal, Robin H. Gil-
bert and Mary T. Staley) for the plaintiffs.

     Stuart E. Schiffer, Acting Assistant Attorney General; David
M. Cohen, Director, and Velta A. Melnbrencis, Assistant Director,
Commercial Litigation Branch, Civil Division, U.S. Department of
Justice; and Office of Chief Counsel for Import Administration,
U.S. Department of Commerce (Robert E. Nielsen), of counsel, for
the defendant.


          AQUILINO, Judge:  As pointed out in the slip opinion 00-7

(Jan. 20, 2000) filed in this case and reported at 24 CIT ___, 86

F.Supp.2d 1308, and in the slip opinion 00-33, 24 CIT ___ (March

31, 2000), filed in the related case numbered 99-11-00716, the

plaintiffs contest not only the Amended Final Results of Expedited

Sunset Review: Iron Metal Castings From India, 64 Fed.Reg. 37,509

(July 12, 1999), which were published by the International Trade Administration, U.S. Department of Commerce ("ITA"), but also the "sunset review" determination of the International Trade Commission ("ITC") pursuant to 19 U.S.C. §1675(c)(1) (1995) that

> revocation of the countervailing duty order on iron metal castings from India would not be likely to lead to continuation or recurrence of material injury to an industry in the United States within a reasonably foreseeable time.

Iron Metal Castings From India; Heavy Iron Construction Castings From Brazil; and Iron Construction Castings From Brazil, Canada, and China, 64 Fed.Reg. 58,442 (Oct. 29, 1999). That determination led the ITA to publish its notice of Revocation of Countervailing Duty Order: Iron Metal Castings From India, 64 Fed.Reg. 61,602 (Nov. 12, 1999).

I

Plaintiffs' complaint against the ITA focuses on the agency's July 1999 Amended Final Results, supra, averring in one count that they are not supported by substantial evidence on the record or otherwise in accordance with law and in a second count that the ITA's determination of countervailable subsidy rates is "erroneous, being significantly understated." Plaintiffs' motion for judgment upon the agency record, subsequently filed pursuant to CIT Rule 56.2, specifies the following grounds for its complaint, to wit: (a) The Engineering Export Promotion Council of India ("EEPC") was not entitled to comment on the ITA's Final Results of

Expedited Sunset Review: Iron Metal Castings From India, 64 Fed.Reg. 30,316 (June 7, 1999), because it had waived participation in the underlying administrative proceeding; (b) to the extent the domestic industry [plaintiffs herein] pointed to ministerial errors in that review, the EEPC's attempted reply thereto was untimely; (c) even if the ITA had been at liberty to take the EEPC's views into account, the agency could not have concluded from the record developed that India's International Price Reimbursement Scheme ("IPRS") and Cash Compensatory Support ("CCS") program had been completely discontinued; and (d) the ITA erred in its method of calculating subsidy rates for programs countervailed subsequent to the original investigation.

A

The ITA commenced its review of the countervailing-duty order[1] at issue in accordance with 19 U.S.C. §1675(c) (1995)[2] to determine whether revocation of that order would be likely to lead to continuation or recurrence of a countervailable subsidy. Notice of Initiation of Five-Year ("Sunset") Reviews, 63 Fed.Reg. 58,709

---

[1] Certain Iron Metal Castings From India: Countervailing Duty Order, 45 Fed.Reg. 68,650 (Oct. 16, 1980).

[2] The statutory provisions requiring such five-year or "sunset" reviews of existing antidumping- and countervailing-duty orders were added to the Tariff Act of 1930 by the Uruguay Round Agreements Act, Pub. L. No. 103-465, 108 Stat. 4809 (Dec. 8, 1994) ("URAA").

References hereinafter to those provisions will be as codified as of the time of the underlying administrative proceeding now at bar unless otherwise cited.

(Nov. 2, 1998). The agency received a timely-filed notice of intent to participate, as well as a complete substantive response, on behalf of the Municipal Castings Fair Trade Council and its individual members, the plaintiffs now at bar. The EEPC filed a waiver on behalf of the Indian exporters subject to the order, while their government did not respond to the notice of initiation.

In the absence of any substantive response by a respondent interested party, the ITA proceeded with an expedited review of the order and determined that its revocation would be likely to lead to continuation or recurrence of a countervailable subsidy, at rates ranging from 0.84 to 1.82 percent. See Final Results, 64 Fed.Reg. at 30,320. The domestic petitioners commented that those Final Results reflected certain ministerial errors. Specifically, according to them, the ITA

> failed to include the subsidy rate for . . . IPRS . . . in its final results . . .. The domestic industry, citing the *Sunset Policy Bulletin*, stated that the Department normally "will not make adjustments to the net countervailable subsidy rate for programs that still exist, but were modified subsequent to the order . . . to eliminate exports to the United States (or subject merchandise) from eligibility." The domestic industry argued that Indian foundries that exported heavy castings . . . to the United States were simply told not to make claims for IPRS benefits on those castings. Further, the domestic industry argued that there has never been any termination of the IPRS program overall, and the program continues today.

64 Fed.Reg. at 37,510. The agency thereupon accepted rebuttal from the EEPC, which

argued that the domestic industry was incorrect in stating that the IPRS program continues to exist [and] asserted that the Department has information on the record of the 1994 administrative review segment of this proceeding stating that the Indian Ministry of Commerce withdrew the IPRS, effective April 1, 1994. Further, the EEPC state[d] that this withdrawal applied to all exporters and all products.

Id. This caused the petitioners to retort

that the EEPC ha[d] waived its right to participate in this sunset review . . . and the Department should, therefore, reject the EEPC's . . . submission. Further-more, the domestic industry state[d] that it knows of no finding that the IPRS has been terminated, with respect to all exporters and all products.

Id.

The ITA issued its Amended Final Results, conceding that it had committed a ministerial error but explaining that the necessary correction left the net subsidy rate unchanged:

. . . The Department's decision to consider the IPRS program terminated based upon the fact that the program had been modified to exclude exports of heavy castings to the United States was . . . in error because reliance on modification as a basis for finding a program completely terminated is inconsistent with our *Sunset Policy Bulletin*.

However, based on the domestic industry's minis-terial allegation and the EEPC's reply, the Department has reexamined all relevant information pertaining to the termination of the IPRS program. The Department located a submission from the Indian Ministry of Commerce, dated April 4, 1994, which demonstrates that the Government of India has fully and completely eliminated the IPRS program (*see* November 19, 1996 Verification Report . . ., placed on the record of this sunset review on July 2, 1999). Specifically, the Indian Ministry of Commerce states that "it has been decided to withdraw the . . . IPRS[] with effect from 01.4.1994, i.e. benefits under the scheme would be available for eligible engineering goods exports shipped up to . . . 31.3.1994 only." (*Id.*)

> Consistent with our *Sunset Policy Bulletin* . . ., this
> evidence of the complete and total withdrawal of the IPRS
> program is the appropriate basis for the Department's
> finding that the IPRS program is terminated.   The
> Department's correction of its ministerial error . . .
> does not change the net subsidy rate reported in the
> original final determination of this sunset review.

Id. (footnotes omitted).  The agency also disagreed that the EEPC's

comments should have been disregarded, reporting that its regula-

tions

> provide[] that if a respondent interested party waives
> participation in the sunset review . . ., the Department
> will not accept or consider any unsolicited submissions
> from that party *during the course of the review*.  The
> EEPC's submission, however, was not made during the
> course of the sunset review.  Rather, the EEPC filed a
> reply to ministerial error comments made by the domestic
> industry *after* the Department had issued its final
> determination . . ..

Id. (emphasis in original).

(1)

In enacting URAA, Congress has mandated expedited

procedures for five-year, sunset reviews whenever there is no or

inadequate response by interested parties to a notice of initiation

by the ITA.[3]  In an action such as this, contesting an expedited

---

[3]  See 19 U.S.C. §1675(c)(3).  If domestic interested parties
fail to respond, the agency must revoke a countervailing-duty order
within 90 days.  See id., §1675(c)(3)(A).

> If interested parties provide inadequate responses
> to a notice of initiation, the [ITA], within 120 days
> after the initiation of the review, . . . may issue,

(footnote continued)

determination under 19 U.S.C. §1675(c)(3), this court shall hold it unlawful if it is arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law.  19 U.S.C. §1516a(b)(1)(B)-(ii).  See 19 U.S.C. §1516a(a)(1)(D).

The defendant asserts herein that the substantial-evidence standard should apply, but the statute and its legislative history are clear that such standard does not govern an expedited sunset review.  Specifically, URAA amended 19 U.S.C. §1516a

> to apply the arbitrary and capricious standard of review . . . [to] final determinations by Commerce and the Commission under section 751(c)(3). Determinations under section 751(c)(3) will be based on limited information in the record resulting from no response or inadequate response to the notice of initiation.  Therefore, such determinations should not be subject to the substantial evidence standard of review.  The substantial evidence standard will apply to final determinations under section 752 which are made on the basis of a fully developed record.  This is consistent with the legislative history of the 1979 [Trade Agreements] Act establishing two standards of review for certain antidumping and counter-vailing duty determinations: arbitrary and capricious for Commission preliminary negative determinations of injury and Commerce determinations not to initiate an investiga-

---

> without further investigation, a final determination based on the facts available, in accordance with section 1677e of this title.

Id., §1675(c)(3)(B).

In addition to the EEPC's formal waiver of participation, the government of India's failure to respond also operated as a waiver of participation under the agency's regulations. See 19 C.F.R. §351.218(d)(2)(iii), (iv) (1998). Upon such waiver in a counter-vailing-duty sunset review, the ITA will conclude that respondent interested parties provided inadequate response to the notice of initiation under the foregoing section 1675(c)(3)(B) and proceed with an expedited review on the basis of facts available. See id.; 19 C.F.R. §351.218(e)(1)(ii)(B),(C) (1998).

>     tion . . . ; and substantial evidence for determinations
>     in final investigations and reviews.

H.R. Rep. No. 103-826, pt. 1, at 57 (1994).  See also S. Rep. No.

103-412, at 47 (1994); Uruguay Round Agreements Act Statement of

Administrative Action ("SAA"), reprinted in H.R. Doc. No. 103-316,

vol. 1, at 880 (1994).  The arbitrary-and-capricious standard is

>     narrow and a court is not to substitute its judgment for
>     that of the agency.  Nevertheless, the agency must
>     examine the relevant data and articulate a satisfactory
>     explanation for its action including a "rational connec-
>     tion between the facts found and the choice made."  In
>     reviewing that explanation, we must "consider whether the
>     decision was based on a consideration of the relevant
>     factors and whether there has been a clear error of
>     judgment."

Motor Vehicle Mfr.'s Ass'n v. State Farm Mut. Auto. Ins. Co., 463

U.S. 29, 43 (1983)(citations omitted). See, e.g., American Lamb Co.

v. United States, 785 F.2d 994, 1004 (Fed.Cir. 1986); Ranchers-

Cattlemen Action Legal Found. v. United States, 23 CIT ___, ___, 74

F.Supp.2d 1353, 1368 (1999) (the court must determine whether there

is a "rational basis in fact" for the agency's determination).

        In determining whether an agency's approach was in

accordance with law, the court follows Chevron U.S.A. Inc. v.

Natural Res. Def. Council, 467 U.S. 837 (1984), which

>     requires the reviewing court to give effect to the intent
>     of Congress if Congress has directly spoken to the
>     precise question at issue and Congress's intent is clear.
>     . . . If, however, Congress has not spoken directly to
>     the issue at bar, the question for the court is whether
>     the agency's interpretation of that issue "is based on a
>     permissible construction of the statute."

Hoogovens Staal BV v. United States, 24 CIT ___, ___ 86 F.Supp.2d 1317, 1324 (2000), quoting Chevron, 467 U.S. at 843.  See also Enercon GmbH v. Int'l Trade Comm'n, 151 F.3d 1376, 1381 (Fed.Cir. 1998), cert. denied, 526 U.S. 1130 (1999) (an agency's interpretation of a statute must be reasonable in light of its language, policies and legislative history).


(2)


The plaintiffs allege that "Commerce erred because it had no discretion to accept a reply from the EEPC to the domestic industry's ministerial error comments, since the EEPC had waived its participation in the sunset review".  Plaintiffs' Rule 56.2 Brief, p. 17.  The statute provides in relevant part:

**(4) Waiver of participation by certain interested parties**

**(A)  In general**

An  interested  party  described  in  section 1677(9)(A) or (B) of this title may elect not to participate  in  a  review  conducted  by  the  [ITA] under  this  subsection  and  to  participate  only  in the  review  conducted  by  the  Commission  under  this subsection.

**(B)  Effect of waiver**

In  a  review  in  which  an  interested  party waives  its  participation  pursuant  to  this  paragraph,  the  [ITA]  shall  conclude  that  revocation  of the  order  or  termination  of  the  investigation  would be  likely  to  lead  to  continuation  or  recurrence  of .  .  .  a  countervailable  subsidy  .  .  .  with  respect to  that  interested  party.

19 U.S.C. §1675(c).  The ITA's regulations explain:

> . . . If a respondent interested party waives participa-
> tion in a sunset review . . ., the Secretary will not
> accept or consider any unsolicited submissions from that
> party during the course of the review.  Waiving partici-
> pation in a sunset review will not affect a party's
> opportunity to participate in the sunset review conducted
> by the International Trade Commission.

19 C.F.R. §351.218(d)(2)(i)  (1998).

Be those provisions as they are, with regard to the correction of ministerial errors, the statute provides that the ITA

> shall establish procedures for the correction of ministe-
> rial errors in final determinations within a reasonable
> time after the determinations are issued under this
> section.  Such procedures shall ensure opportunity for
> interested parties to present their views regarding any
> such errors.  As used in this subsection, the term
> "ministerial error" includes errors in addition, subtrac-
> tion, or other arithmetic function, clerical errors
> resulting from inaccurate copying, duplication, or the
> like, and any other type of unintentional error which the
> [ITA] considers ministerial.

19 U.S.C. §1675(h).  The related procedures established by the agency provide, among other things, that a party to the proceeding may file ministerial-error comments within specified time limits and that any replies thereto must be filed with the Secretary with-in five days after the date on which the comments were filed.  19 C.F.R. §351.224(c),(d) (1998).  While replies are "limited to issues raised in such comments", there is no express requirement that they be submitted by or on behalf of a party to the proceed-ing.

It is the defendant's interpretation of these provisions which the plaintiffs now complain is erroneous.  Specifically at issue is the agency phrase "during the course of the review".  The plaintiffs argue that the process of correcting ministerial errors is an inherent element of the sunset review and that the ITA failed to follow its regulation by accepting the EEPC's comments after the waiver of participation had been received.  The defendant counters that the proceeding before the agency ended with its publication of the Final Results and that the EEPC submission was not made "during the course of the review".

Neither the statute nor the regulations directly address the precise issue presented herein.  Thus, the question before the court is whether the ITA's interpretation follows from the language, policies, and legislative history of the statute.  Sunset review is defined simply as "a review under section 751(c) of the Act."  19 C.F.R. §351.102(b) (1998).  That section of the statute refers to completion of an expedited review only in terms of the number of days in which the ITA and the ITC must issue their respective final determinations.  See 19 U.S.C. §1675(c)(3)(B), (c)(5).  That is, the statute does not address "the course of the review".  There is no facial indication that the ministerial-error process is included, since it necessarily occurs after publication of final results.

The policy and legislative history of the provisions at issue support the agency's interpretation.  As a part of its Uruguay-Round commitments, the United States agreed that a "countervailing duty shall remain in force only as long and to the extent necessary to counteract subsidization which is causing injury."  Agreement on Subsidies and Countervailing Measures, April 15, 1994, art. 21.1, reprinted in H.R. Doc. No. 103-316, vol. 1, at 1556 (1994).  The United States further agreed to provide for the termination of countervailing-duty orders after five years, unless the ITA and the ITC determine that revocation would be likely to lead to continuation or recurrence of subsidization and material injury.  Id., art. 21.3.  This policy, among others, was implemented by URAA, supra.  Thus, the underlying purpose of a countervailing-duty sunset review is to eliminate those outstanding orders which are no longer viable.

A concurrent goal of Congress in providing for expedited sunset reviews was "to eliminate needless reviews and promote administrative efficiency."  H.R. Rep. No. 103-826, pt. 1, at 56. This aim is effectuated by 19 U.S.C. §1675(c)(3)(B), which, as noted above, provides for expedited review if there is inadequate response to a notice of initiation either by domestic or foreign interested parties.  This is particularly important with regard to the latter interests:

As a practical matter, in five-year reviews conducted by Commerce regarding the likelihood of continuation or recurrence of countervailable subsidies, an adequate response to an initial request for information must include a response from the foreign government in question. The participation of the foreign government is indispensable, because only that government is in a position to explain its actions and intentions with respect to present and future subsidization. Therefore, the Administration intends that if the relevant foreign government does not respond, Commerce will proceed in accordance with section [1675(c)(3)(B)], and will rely on evidence provided by the domestic industry.

H.R. Doc. No. 103-316, vol. 1, at 880. Thus, where a foreign government elects not to participate, Congress has placed added emphasis on administrative efficiency in countervailing-duty sunset reviews, making waiver of participation available in an effort to "reduce the burden on all parties". S.Rep. No. 103-412, at 46; H.R. Rep. No. 103-826, pt. 1, at 57.

While this language at first glance would appear to support plaintiffs' position that the ITA should not have accepted any information from the EEPC in view of the waiver, the statute and its legislative history must be read as a whole. Cf. Japan Whaling Ass'n v. American Cetacean Soc'y, 478 U.S. 221 (1986) (while "scattered statements" supported respondents' position, the statute and legislative history as a whole precluded its acceptance). The push for efficiency should not erode other important policies expressed in the statute. In particular, the ministerial-error provisions of section 1675 underscore the need for both accuracy and efficiency, allowing the agency to amend determina-

tions without "expensive litigation that unnecessarily burdens the court system, in order to correct essentially unintended errors." Federal-Mogul Corp. v. United States, 16 CIT 975, 981, 809 F.Supp. 105, 111 (1992), quoting H.R. Rep. No. 100-40, pt. 1, at 144 (1987).  Indeed, "it is axiomatic that fair and accurate determinations are fundamental to the proper administration of our [trade] laws[, and] courts have uniformly authorized the correction of any clerical errors which would affect the accuracy of a determination."  Koyo Seiko Co. v. United States, 14 CIT 680, 682, 746 F.Supp. 1108, 1110 (1990), and cases cited therein.

The fact that foreign interested parties have waived participation in a proceeding does not absolve the ITA of its responsibility to reach an accurate result.  In fact, accuracy may be even more important if the U.S. government intends to encourage foreign respondents to consider waiver as a realistic option.  Moreover, allowing a party that has waived participation to reply to ministerial-error comments can hardly be expected to derail the intended expedition of a review.  The correction of ministerial errors does not require the agency to begin anew, nor should it result in unnecessary delay.  See, e.g., NTN Bearing Corp. v. United States, 74 F.3d 1204 (Fed.Cir. 1995).  Indeed, court-ordered amendments have been held "not destructive of the ITA's ability to manage its proceedings", e.g., Brother Indus., Ltd. v. United States, 15 CIT 332, 341, 771 F.Supp. 374, 384 (1991), and voluntary

correction by the agency could eliminate any need for judicial

intrusion.[4]   Notwithstanding the nature of the contested instant

_____

[4]   The court cannot accept plaintiffs' argument that the
attempt to distinguish comments made in connection with ministerial
errors from other substantive submissions is "ludicrous" and
"nothing more than a way for Commerce to shoehorn information into
the record that was not placed on the record in a timely fashion."


     In a sunset review, the ITA is to provide the ITC with the net
countervailable subsidy that is likely to prevail if an order is
revoked. See 19 U.S.C. §1675a(b)(3). Even in an expedited review
being conducted on the basis of facts available, the ITA
necessarily relies on countervailing duty rates "as applicable,
from prior Department determinations".  19 C.F.R. §351.308(f)(1)
(1998). See Policies Regarding the Conduct of Five-year ("Sunset")
Reviews of Antidumping and Countervailing Duty Orders; Policy
Bulletin, 63 Fed.Reg. 18,871, 18,876 (April 16, 1998) (adjustments
to the subsidy rate from the investigation are appropriate where
changes in the program have occurred that are likely to affect the
net countervailable subsidy likely to prevail after revocation).


     The ITA duly reviewed its prior determinations in this matter,
specifically citing changes in subsidy programs over the history of
the order in its Final Results. See 64 Fed.Reg. at 30,319-20 ("As
a result of changes in programs since the imposition of the . . .
order, the Department has determined that using the net
countervailable subsidy rates, as determined in the original
investigation, is no longer appropriate").


     To require the agency to correct a ministerial error in the
final results of a sunset review without re-examination of the
specific issue in the determinations preceding it would indeed be
ludicrous, particularly where relevant information may simply have
been overlooked given the underlying order's history and the
statutory time constraints.  It has been held, for example, that


     those documents at the agency which become sufficiently
     intertwined with the relevant inquiry are part of the
     record, no matter how or when they arrived at the agency.


                                        (footnote continued)

case, ministerial errors are rarely the source of debate, as they are "by their nature not errors in judgment but merely inadvertencies [sic]." NTN Bearing Corp. v. United States, 74 F.3d at 1208. Therefore, the court finds that the minimal burden on the parties and the agency of accepting ministerial-error replies from interested parties which waived participation in a sunset review is outweighed by the interest in fair and accurate determinations by the ITA. In light of the relevant statutory language, policies, and legislative history, the court concludes that the agency's interpretation is in accordance with law and not arbitrary, capricious, or an abuse of discretion.

_____

\* \* \*

> . . . [I]n a case . . . where the agency in its decision states without qualification that it has examined "the original investigations . . .," the court must assume that all relevant information from those previous investigations is before the agency for the purpose of the current decision. . . . As the agency expressly incorporated such information into the proceeding at issue, without such information the decision at issue cannot be reviewed properly.

Floral Trade Council v. United States, 13 CIT 242, 243, 709 F.Supp. 229, 230-31 (1989). Cf. Sanyo Elec. Co. v. United States, 23 CIT ___, ___, 86 F.Supp.2d 1232, 1240-41 (1999) (data from earlier administrative review properly excluded from later review because ITA did not "expressly incorporate" it in the record); Mitsuboshi Belting Ltd. v. United States, 18 CIT 98, 103 (1994) (refusing to add information from a prior administrative review to the record of a subsequent review because the data were not intertwined, and, unlike Floral Trade Council, the action did not concern the scope of the order, in which circumstance "the agency is required to re-examine the . . . determination").

B

The plaintiffs also argue that the ITA erred in accepting comments from the EEPC because they were not timely filed, and "the agency had no discretion whatsoever to accept untimely replies to ministerial error comments." Plaintiffs' Rule 56.2 Reply Brief, p. 1 (emphasis in original). This court cannot, and therefore does not, concur.

While, as a general rule, an agency is required to comply with its own regulations, e.g., Cummins Engine Co. v. United States, 23 CIT ____, ____, 83 F.Supp.2d 1366, 1378 (1999), the Supreme Court has stated that

> "[i]t is always within the discretion of a[n] . . . administrative agency to relax or modify its procedural rules adopted for the orderly transaction of business before it when in a given case the ends of justice require it. . . . [S]uch a case is not reviewable except upon a showing of substantial prejudice to the complaining party."

American Farm Lines v. Black Ball Freight Service, 397 U.S. 532, 539 (1970), quoting NLRB v. Monsanto Chem. Co., 205 F.2d 763, 764 (8th Cir. 1953). See Kemira Fibres Oy v. United States, 61 F.3d 866, 875 (Fed.Cir. 1995). In other words, "not every failure of an agency to observe timing requirements voids subsequent agency action, especially when important public rights are at stake." 61 F.3d at 871, citing Brock v. Pierce County, 476 U.S. 253, 260 (1986). These principles apply to procedures specifically mandated

by statute, as well as to those crafted by an agency exercising
statutory discretion via regulations:

> . . . [I]n the context of an agency's failure to comply
> with statutorily-mandated timing directives, the Supreme
> Court has rejected the argument that non-compliance with
> a timing requirement renders subsequent agency action
> voidable, instead recognizing that "if a statute does not
> specify a consequence for noncompliance . . . , the
> federal courts will not in the ordinary course impose
> their own coercive sanction."
>
>                          *   *   *
>
> The argument rejected by the Supreme Court is even
> less cogent when . . . the relevant statute does not
> provide a timing requirement, but the requirement is
> found in the administering agency's implementing regula-
> tions.  . . . The national interest in the regulation of
> importation should not fall victim to an oversight by
> Commerce . . ..

Id. at 872-73 (citation omitted).

Section 1675(h) of Title 19, U.S.C. gives the ITA dis-
cretion to establish procedures for the correction of ministerial
errors in final determinations "within a reasonable time", and the
agency has accordingly done so.  See 19 C.F.R. §351.224  (1998).
With regard to replies to ministerial-error comments, the regula-
tion provides that they "be filed within five days after the date
on which the comments were filed with the Secretary."  Id.,
§351.224(c)(3).  Neither the statute nor the regulation provides
for the agency's failure to enforce its own deadline for replies.
Nowhere is it suggested that such a circumstance void the final
results, particularly when the ministerial-error process is none-

theless completed within a "reasonable time" after the determina-
tion issues in accordance with the statutory mandate. Moreover, it
has been recognized that the ITA "normally has the discretion to
accept or reject untimely filed submissions . . .. Commerce
routinely accepts and rejects [such] submissions depending on the
circumstances of each case." Böwe-Passat v. United States, 17 CIT
335, 337 (1993).

In the light of the foregoing principles, the court
cannot remand this case because of the timing of the EEPC submis-
sion unless the plaintiffs show that they were substantially
prejudiced by its acceptance. They first assert such prejudice by
explaining that before receiving the EEPC reply

> Commerce was prepared to accept plaintiffs' minis-
> terial error allegation . . . and reverse its de-
> termination that the IPRS program had been terminated.
> . . . But Commerce ultimately reached the opposite
> result upon considering th[at] . . . submission . . ..
> If Commerce had not considered the untimely EEPC submis-
> sion, Commerce would thus have reversed its finding that
> the program had been completely terminated and would,
> instead, not have deducted an amount for the IPRS subsidy
> program from the rates it found. This would have
> resulted in a significant increase in the net
> countervailable subsidy rates . . ..

Plaintiffs' Rule 56.2 Reply Brief, pp. 2-3. However, a party is
not

> "prejudiced" by a technical defect simply because that
> party will lose its case if the defect is disregarded.
> Prejudice, as used in this setting, means injury to an
> interest that the statute, regulation or rule in question
> was designed to protect.

Intercargo Ins. Co. v. United States, 83 F.3d 391, 396 (Fed.Cir. 1996) (citations omitted), cert. denied, 519 U.S. 1108 (1997).  The mere fact that the ITA might have reached a result more favorable to the plaintiffs had it refused to consider the EEPC reply does not amount to substantial prejudice.[5]

The plaintiffs also assert prejudice in that the ITA's disregard of its regulations led it to consider "a critical, complicated, and highly contested legal and factual issue without affording plaintiffs any meaningful opportunity to have their views on this issue considered as well."  Plaintiffs' Rule 56.2 Reply Brief, p. 4.  They focus not on the approach to ministerial errors but on the absence in an expedited review of a preliminary determination, case and rebuttal briefs, and a hearing.  They further assert that by accepting an untimely reply, the agency "allowed the EEPC effectively to retract its waiver without giving the domestic industry the corresponding procedural rights and benefits it would have had if the EEPC had participated in the sunset review from the outset".  Id. at 6.

---

[5]  The agency was not precluded from attempting to correct its admitted error based on the domestic industry's comments alone. Having conceded that it relied on inadequate evidence of termination in the Final Results, the ITA could have sought to correct it by reviewing information pertaining to that issue already in the record of the proceeding.  See supra note 4. Assuming the agency located the same documentation presented by the EEPC, its determination might have been identical to that now at bar.

The court cannot concur in this argument.  The plaintiffs themselves raised the issue of ministerial error, but are now dissatisfied that the ITA's reaction did not achieve the desired result.  Indeed, the agency afforded them a greater opportunity to respond to the EEPC reply than is provided for by the regulations, which refer only to "comments".  See 19 C.F.R. §351.224(c) (1998).  It accepted rebuttal from the plaintiffs, which contended that the EEPC reply should not have been accepted and that the agency had made no finding that IPRS was terminated "across the board to all exporters and all products" as the EEPC claimed.  Plaintiffs' Appendix, tab 8.  After the Amended Final Results came forth, the plaintiffs again filed comments, which the agency accepted, stressing the same point.  See id., tab 9.

It has been held under similar circumstances that acceptance of untimely submissions by the ITA results in no substantial prejudice based merely on the enforcement of the same regulatory time limits in other cases, particularly when the party opposing the untimely information has also been allowed to respond.  E.g., Taiyuan Heavy Mach. Import & Export Corp. v. United States, 23 CIT ___, ___, Slip Op. 99-103, pp. 8-9 (Oct. 6, 1999).  That is, where the party opposing the timing of the submission of information is not held to a different standard, no prejudice occurs.  The plaintiffs in this case were not held to a different standard, having alleged a ministerial error and having been given wider latitude than the regulations actually provide.

Furthermore, there is no denial of due process where, as here, the complainants are unable to demonstrate specifically how their participation was impaired by the agency's action. See, e.g., id. at 9. The "prejudice" to which the plaintiffs now attempt to point was not a result of the ITA's acceptance of untimely comments, rather a necessary consequence of the expedited review process. The prerogative to waive participation rests with respondent interested parties in a sunset review, and petitioners can neither force them to participate in a full review nor preclude their pointing to ministerial errors after the review ends. The expedited process in itself does not deny domestic interested parties their due; it simply means that any substantive issues arising out of the final results, as well as any further disputes over correction of ministerial errors, must and can be resolved via judicial review. Thus, plaintiffs' alleged inability to have their views more fully considered before the agency was merely the result of the expedition in accordance with the ITA's regulations rather than any actionable shortcoming on the part of the agency. In sum, even if the EEPC reply had been received earlier, the outcome would presumably have been the same, and the plaintiffs were not substantially prejudiced by its timing.

C

The plaintiffs argue in the alternative that, even if the ITA properly considered the EEPC reply, the agency's conclusion

that IPRS was terminated lacks a rational basis in fact. In essence, they contend that the ITA's failure to consider the method of termination and likelihood of reinstatement contravened its own published policies for sunset reviews and ignored record evidence that the program was never "completely and fully" terminated.

(1)

As noted above, an agency is generally required to comply with its own regulations. E.g., Kemira Fibres Oy v. United States, 61 F.3d at 871, citing Dodson v. U.S. Dep't of the Army, 988 F.2d 1199, 1204 (Fed.Cir. 1993). In reviewing an ITA determination, the court

> must evaluate [its] validity . . . on the basis of the reasoning presented in the decision itself. An agency determination "cannot be upheld merely because findings might have been made and considerations disclosed which would justify its order . . .." Nor may "post hoc rationalizations" of counsel supplement or supplant the rationale or reasoning of the agency.

Hoogovens Staal BV v. United States, 24 CIT at ___, 86 F.Supp.2d at 1331 (citations omitted). While the court will uphold a decision of less-than-ideal clarity if the agency's path may be reasonably discerned, e.g., Colorado Interstate Gas Co. v. FPC, 324 U.S. 581, 595 (1945), it may not conjure a reasoned basis for the agency's action that Commerce itself has not given. SEC v. Chenery Corp., 332 U.S. 194, 196-97 (1947). See also Hoogovens Staal BV v. United States, 22 CIT ___, ___, 4 F.Supp.2d 1213, 1219 (1998).

Under URAA, congressional intent clearly is that, if a

foreign government has eliminated a subsidy program, . . .
Commerce will consider the legal method by which the
government eliminated the program and whether the govern-
ment is likely to reinstate the program.  For example,
programs eliminated through administrative action may be
more likely to be reinstated than those eliminated through
legislative action.

H.R. Doc. No. 103-316, vol. 1, at 888.  Recognizing this direction,

the ITA's published policies also require consideration of the

method of revocation and likelihood of reinstatement when a subsidy

is terminated.  See Policies Regarding the Conduct of Five-Year

("Sunset") Reviews of Antidumping and Countervailing Duty Orders;

Policy Bulletin, 63 Fed.Reg. 18,871, 18,875, §III.A.5 (April 16,

1998).  The agency "normally will determine that programs elimi-

nated through administrative action are more likely to be rein-

stated than those eliminated through legislative action."  Id.

Furthermore, in calculating the net countervailable subsidy likely

to prevail if an agency order is revoked, the ITA will "normally"

adjust the rate determined in the original investigation "[w]here

[it] has conducted an administrative review of the order . . . and

found that a program was terminated with no residual benefits and

no likelihood of reinstatement".  Id. at 18,876, §III.B.3(a).

(2)

The document submitted by the EEPC and later located by

the ITA in the record of its 1994 administrative review is a letter

from the Indian Ministry of Commerce to the EEPC stating that "it

has been decided to withdraw the . . . IPRS[] with effect from 01.4.1994, i.e. benefits under the Scheme would be available for eligible engineering goods exports shipped up to 31.3.1994 only." Defendant's Exhibit 1, p. 72.  As indicated in the Amended Final Results, the ITA concluded that this document "demonstrates that the Government of India has fully and completely eliminated the IPRS program"[6], apparently adopting the position in the EEPC reply that the withdrawal "applied to all exporters and all products". While the agency did cite the 1996 and 1997 verification reports from administrative reviews as evidence that no residual benefits exist under IPRS, it provides neither analysis of the method of termination nor consideration of the likelihood of reinstatement.

The ITA claims that its conclusion is consistent with its *Sunset Policy Bulletin*, supra, citing §III.B.3(a).  This court cannot agree.  As the plaintiffs point out, "a pronouncement from an Indian government administrative agency[] is precisely the type of government action that Congress cautioned Commerce against using as the basis for a finding of termination."  Plaintiff's Rule 56.2 Reply Brief, p. 8.  Moreover, while the document presented by the EEPC was a part of the record of the 1994 administrative review, the agency never made a formal finding that IPRS was terminated. Instead, it repeatedly characterized the subsidy program as one

---

[6] 64 Fed.Reg. at 37,510.

"not used"[7].  While the defendant correctly states that legislative action is "<u>not</u> a mandatory prerequisite before Commerce may conclude that a program has been eliminated"[8], it is *mandatory* that the ITA give a reasoned explanation for a departure from its established norms.  <u>E.g.</u>, <u>Torrington Co. v. United States</u>, 15 CIT 456, 461, 772 F.Supp. 1284, 1288 (1991).  Here, the legislative intent and the agency policy are that an adjustment be made to the subsidy rate where a program is terminated with no likelihood of reinstatement and that those terminated by administrative action are more likely to be reinstated than if terminated legislatively. The ITA has not followed that policy here, and this matter must be remanded for consideration of the controlling factors.  <u>See</u>, <u>e.g.</u>, <u>Former Employees of Alcatel Telecomm. Cable v. Herman</u>, 24 CIT ___ , ___, Slip Op. 00-88,  p. 7 (July 27, 2000) (agency decision not based on a consideration of the relevant factors is arbitrary and capricious).

_____

    [7]  <u>See</u>, <u>e.g.</u>, <u>Certain Iron-Metal Castings From India; Final Results of Countervailing Duty Administrative Review</u>, 62 Fed.Reg. 32,297, 32,299 (June 13, 1997); <u>Certain Iron-Metal Castings From India; Final Results and Partial Rescission of Countervailing Duty Administrative Review</u>, 63 Fed.Reg. 64,050, 64,051 (Nov. 18, 1998). The ITA had previously stated that the government of India "officially terminated" IPRS with respect to exports of the subject merchandise, but this was apparently the source of the ministerial error in the sunset review, as the agency went on to explain that it had verified that by examining a Ministry of Commerce circular which stated that "IPRS claims are not to be made on exports of the subject merchandise to the United States."  <u>Final Results of Countervailing Duty Administrative Review: Certain Iron-Metal Castings From India</u>, 56 Fed.Reg. 41,658, 41,662 (Aug. 22, 1991) (1987 period of review).

    [8]  Defendant's Memorandum, p. 26 (emphasis in original).

Counsel for the defendant offer the following explanation for the failure to analyze the necessary factors:

> In situations in which a program was initiated by administrative action and subsequently terminated administratively, Commerce has determined that the program at issue has been eliminated for purposes of its sunset review calculations. For example, in its sunset review of live swine from Canada, Commerce explained:
>
>> . . . The Department agrees that the elimination of a program administratively is not as strong a basis for a finding of termination as elimination through legislative action. . . . However, <u>where a program was put in place administratively, it is reasonable to expect that the government would terminate the program in the same manner</u>. In these circumstances, unless there is a basis for concluding that the government is likely to reinstate the program, we continue to believe it is appropriate to treat a program previously found to be terminated in an administrative review as terminated for the purpose of sunset reviews.

Defendant's Memorandum, p. 27 (citations omitted, emphasis in original). While it may be true that the ITA has previously employed such reasoning, this fact alone does not absolve its explaining its rationale in the <u>Amended Final Results</u> at bar. Belated presentation by counsel in court, rather than in the agency's published decision, is simply unacceptable post-hoc rationalization. Moreover, the proffered reasoning is inapposite here. As noted above, despite the letter on the record of the 1994 review, IPRS was neither then, nor later, "found to be terminated in an administrative review" by the ITA.

(3)

The plaintiffs also allege that there is no rational basis for the ITA's conclusion that India's CCS program was terminated. Unlike IPRS, however, the ITA has found in the course of an administrative review that that program was completely terminated. Certain Iron-Metal Castings From India: Final Results of Countervailing Duty Administrative Review, 60 Fed.Reg. 44,849, 44,851 (Aug. 29, 1995). While the court cannot be expected, and indeed has no statutory authority in a sunset review, to reopen the merits of every determination in the history of a proceeding[9], it

---

[9] The plaintiffs contrast the consequence of a termination finding in an administrative review with that of a sunset review, explaining that the former involves an adjustment to the subsidy and cash deposit rates, which can be readjusted in a subsequent review if the program is reinstated. Plaintiffs' Rule 56.2 Reply Brief, p. 11. However, according to the plaintiffs, in the latter context "there is no way to reinstate the . . . order." Id.

Whatever the validity of this assessment, it cannot support plaintiffs' further claim that the legislative history and *Sunset Policy Bulletin* impose "a more rigorous standard" for evaluating termination issues than is required in regular administrative reviews. See id., pp. 13-14. If this were true, section III.B.3-(a) of the *Bulletin* would be superfluous because no administrative-review finding would ever be adequate to support the same finding in a sunset analysis.

The termination of the CCS program undermines plaintiffs' position. See 60 Fed.Reg. at 44,851. In the 1990 administrative review, for example, the ITA followed its regular practice, as reflected in its regulations and explained in Countervailing Duties; Notice of Proposed Rulemaking and Request for Public Comments, 54 Fed.Reg. 23,366 (May 31, 1989). Specifically, in establishing the estimated countervailing-duty cash deposit rate, the agency accounted for "program-wide changes", defined in part as those "implemented by an official act, such as the enactment of a

(footnote continued)

notes that the ITA considered the method of termination and the likelihood of reinstatement in that particular administrative review. Despite the Indian government's official announcement's having referred to both "suspension" and "termination" of CCS, the ITA verified that the program was "altogether terminated by the Ministry of Commerce . . . from 3rd July 1991 and there is no plan to reinstate it." Plaintiffs' Exhibit 12, tenth page (EEPC response to supplemental questionnaire in administrative review for 1990).

Hence, with regard to the CCS program herein, the ITA followed its "normal" practice of adjusting the subsidy likely to prevail upon revocation to reflect the termination of that program with no residual benefits or likelihood of reinstatement. *Sunset Policy Bulletin*, 63 Fed.Reg. at 18,876, §III.B.3(a). The court cannot concur with plaintiffs' position that such an adjustment was arbitrary and capricious.

---

. . . decree". Id. Moreover, the policy provided that the ITA would not make an adjustment for the termination of a program whenever it determines that "residual benefits continue[] to be bestowed". Id. at 23,378.

The agency verified that CCS was terminated, with no plan of reinstatement, "by an official government announcement" and found "no evidence of any application for or receipt of residual benefits under the CCS program." 60 Fed. Reg. at 44,851. Without reopening the merits of that determination, it is obvious that the findings are based on considerations almost identical to those required by the *Sunset Policy Bulletin*.

(4)

The plaintiffs argue that, even if the evidence concern-

ing IPRS and CCS was properly considered, and tended to support the

ITA's approach,

> the law mandates verification of any such evidence
> before Commerce can revoke the subject order.  Section
> 782(i) of the statute states that "[t]he administering
> authority <u>shall</u> verify all information relied upon in
> making . . . a revocation under section 751(d) . . .."
> 19 U.S.C. §1677m(i)(2) (emphasis added). The revocations
> encompassed by section 751(d) of the statute include
> revocations in five-year (sunset) reviews.  19 U.S.C.
> §1675(d)(2).  Accordingly, the statute mandates that
> verification be conducted prior to revoking an order in
> a sunset review.
>
>
> Commerce has adopted new regulations addressing this
> statutory requirement.  Section 351.307(b) . . . echoes
> the mandate of the statute, stating "the Secretary will
> verify factual information upon which the Secretary
> relies in . . . [a] revocation under section 751(d) of
> the Act."  19 C.F.R. §351.307(b)(iii).  The plain
> language of the statute and this regulatory provision,
> therefore, require a verification of any factual informa-
> tion on which the Secretary intends to rely in issuing a
> revocation.

Plaintiffs' Rule 56.2 Brief, p. 35.  The defendant disagrees,

explaining that it

> has reasonably interpreted the statutory verification
> requirements for sunset reviews to apply when Commerce,
> itself, determines that an order should be revoked based
> upon a determination that revocation would not be likely
> to lead to a continuation or recurrence of (in this case)
> a countervailable subsidy.  The pertinent part of the
> <u>Sunset Regulations</u> is clear on this point:
>
>> *Verification*.-(i) In general.  The Department
>> will verify factual information relied upon in
>> making its final determination normally only
>> in a full sunset review . . . and only where
>> needed.  The <u>Department will conduct verifica-</u>
>> <u>tion normally only if, in its preliminary</u>

> results, the Department determines that revo-
> cation of the order . . . is not likely to
> lead to a continuation or recurrence of a
> countervailable subsidy or dumping . . ..

> 19 C.F.R. §351.218(f)(2)(i) (emphasis added).   In other
> words, if Commerce determines during a sunset review that
> revocation is warranted, it will conduct a verification.
> In this case, Commerce made no [such] determination  . . ..
> Therefore, no verification was required.

Defendant's Memorandum, p. 33.

At first blush, the statute appears to require verification whenever the ITA revokes an order after a sunset review. However, a closer examination reveals that the language is in fact unclear and that the practical effect of plaintiffs' interpretation is at odds with the intent of URAA.  Specifically at issue is the meaning of the phrase "making a revocation".  This could either include any revocation carried out by the agency, or only those where the ITA directly contributes by making a negative determination on the likelihood of continuation or recurrence of subsidization.  As the defendant points out, plaintiffs' position would require the agency

> to conduct a verification in every sunset review because
> it has no ability to anticipate those instances in which
> the Commission will make a negative injury determination
> so that the particular order must subsequently be
> revoked.  Yet, it is clear from the statutory and
> regulatory provisions that it was not intended to require
> Commerce to conduct a verification in every sunset
> review.  In fact, such a requirement would place and
> [*sic*] enormous burden on Commerce in terms of the time,
> personnel, and financial resources that would be needed
> for such an undertaking.  In addition, respondents would
> be subject to similar burdens preparing for and partici-
> pating in such verifications.  This result runs counter

> to the option Congress expressly made available to
> respondents permitting them to waive their participation
> in Commerce's sunset reviews.  In enacting this provi-
> sion, Congress observed that it had "made this option
> available in an effort to reduce the burden on all
> parties."  Plaintiffs' interpretation, which would lead
> to automatic verifications in all sunset reviews, would
> completely thwart this option.

Id. at 33-34 (citations omitted).  The court agrees that the impact
of plaintiffs' interpretation would run counter to the statutory
intent as expressed in the legislative history and discussed in
part A, supra.  The ITA has reasonably interpreted the statutory
requirement to mean that verification is not required in an
expedited sunset review where it made no determination that
subsidization was likely to continue if its underlying order were
revoked.

Moreover, even if verification were generally necessary
in expedited sunset reviews that resulted in revocation of an
order, the particular type of information at issue in this case
appears to be excepted from such a requirement by the statutory
provisions governing determinations on the basis of facts available
and the associated legislative history.  As previously discussed,
19 U.S.C. §1675(c)(3)(B) provides that, where interested parties
provide inadequate response to a notice of initiation, the ITA may
issue a final determination in accordance with 19 U.S.C. §1677e,
relying on the "facts otherwise available".  Those facts may
include secondary information such as that "derived from . . . any

previous review under [19 U.S.C. §]1675".[10]  The ITA's conclusions

regarding the termination of IPRS and CCS were derived from

previous administrative reviews under 19 U.S.C. §1675(a).  Section

1677e further provides:

### (c) Corroboration of secondary information

> When the [ITA] . . . relies on secondary informa-
> tion rather than on information obtained in the course of
> an investigation or review, the [ITA] . . . shall, to the
> extent practicable, corroborate that information from
> independent sources that are reasonably at their dis-
> posal.

The legislative history explains how this provision applies, for

example, in a sunset review:

> . . . The Administration does not intend that the corrob-
> oration requirement will apply when information from a
> prior determination is being used to establish the facts
> concerning the period that was the subject of that prior
> determination.  In such cases, the information is not
> being used "rather than" facts obtained in the course of
> the current . . . review.  This situation may arise, for
> example, when a prior determination is used for evaluat-

---

[10]  19 U.S.C. §1677e(b)(3).  The types of secondary information
that may be relied upon are enumerated in the statutory provision
governing inferences adverse to an interested party which failed to
cooperate by not acting to the best of its ability to comply with
a request for information from the ITA or the ITC.  However, the
court sees no reason to assume that secondary information cannot
also be used as facts otherwise available where no adverse
inference is called for.

Presumably, no adverse inference was drawn in this case
because the EEPC waiver was voluntary, which reduced the burden on
all parties involved herein.  See EEPC Waiver of Participation,
Plaintiffs' Exhibit 4, pp. 1-2 ("The reason for this waiver is that
the [ITA] has just concluded a review of the order . . . and is
about to commence another.  Accordingly, [it] has considerable
amounts of data, and will soon have more, on the current status of
the Indian castings exporters").

ing the likelihood of future injury if an order is
revoked . . . in . . . a five-year review under [19
U.S.C. §1675(c)].

H.R. Doc. No. 103-316, vol. 1, at 870.  Using information from a

prior review to determine whether revocation is likely to lead to

continuation or recurrence of a countervailable subsidy clearly

falls within this reasoning.

D

The plaintiffs also allege that the ITA's methodology for

calculating the net countervailable subsidy violates the statute

and is irrational.  Specifically, they assert that the legislation

is "complete and clear" and that the agency

> did not follow the Sunset Policy Bulletin's instructions
> nor the SAA or House Report's guidelines.  The Sunset
> Policy Bulletin first provides that Commerce will
> "normally" select the rate from the original investiga-
> tion, but then identifies seven situations that may
> justify deviation from the original rate.  Although
> Commerce adjusted the rate from the original investiga-
> tion based on two of the . . . seven adjustments, the
> agency inexplicably ignored a third, equally applicable,
> adjustment that provides that it may select a different
> rate when the subsidy rate has increased in a subsequent
> administrative review.

Plaintiffs' Rule 56.2 Reply Brief, p. 18 (citations omitted).

Furthermore, they contend that the

> individual program rates, individual company rates, and
> "all others" rates selected by the agency in this sunset
> review are lower than rates found in more recent adminis-
> trative reviews.  Thus, by relying on the initial, lower
> rates, Commerce predicted that revocation of the order
> would result in a reduction of countervailable benefits.
> Stated differently, the sunset results imply that re-
> vocation of the order would cause foreign governments

to reduce the amount of subsidies provided to exporters.
Simply put, this result makes no sense. . ..

Id. at 19 (emphasis in original).

The statute requires that the ITA inform the ITC of "the
net countervailable subsidy that is likely to prevail if the order
is revoked or the suspended investigation is terminated."  19
U.S.C. §1675a(b)(3).  Moreover, the ITA "shall normally choose" a
rate that was determined either in the original investigation or an
administrative review of the particular program.  Id.  The
legislative history explains further:

> . . . The Administration intends that Commerce normally
> will select the rate from the investigation, because
> that is the only calculated rate that reflects the
> behavior of exporters and foreign governments without the
> discipline of an order . . . in place.  In certain
> instances, a more recently calculated rate may be more
> appropriate.  For example, if dumping margins have
> declined over the life of an order and imports have
> remained steady or increased, Commerce may conclude that
> exporters are likely to continue dumping at the lower
> rates found in a more recent review.

H.R. Doc. No. 103-316, vol. 1, at 890-91.  See also H.R. Rep. No.
103-826, pt. 1, at 64.  The *Sunset Policy Bulletin* elaborates on
the circumstances under which the agency may adjust the net
countervailable subsidy. Specifically at issue is section III.B.3,
which states in relevant part that

> section 752(b)(1)(B) of the Act provides that the [ITA]
> will consider whether any change in the program which
> gave rise to the net countervailable subsidy determina-
> tion . . . has occurred that is likely to affect the net
> countervailable subsidy.  Consequently, although the SAA
> . . . and the House Report . . . provide that the

[agency] normally will select a rate from the investi-
gation, this rate may not be the most appropriate if,
for example, the rate was derived . . . from subsidy
programs which were found in subsequent reviews to be
terminated, there has been a program wide change, or
the rate ignores a program found to be countervailable
in a subsequent administrative review.

Therefore, the [ITA] may make adjustments to the
net countervailable subsidy . . . including, but not
limited, to the following:

* * *

(d) Where the [ITA] has conducted an administrative
review of the order . . . and determined to increase the
net countervailable subsidy rate for any reason, includ-
ing as a result of the application of best information
available or facts available, the [agency] may adjust the
net countervailable subsidy rate determined in the
original investigation to reflect the increase in the
rate.

It is clear from these provisions that, as a general rule

in sunset reviews, Congress intended that the rate from the

original ITA investigation be referred to the ITC as the net

countervailable subsidy likely to prevail upon revocation since it

would most accurately reflect how exporters would behave in the

absence of an order.  The agency did precisely that in evaluating

the programs in this matter.  Nonetheless, Congress also granted

the ITA discretion to adjust the subsidy whenever it determines

that a more recently calculated rate would be more appropriate.  In

reviewing the rates chosen, the court is cognizant of this

discretion to decide when an adjustment would aid in reaching a

more accurate determination of the net countervailable subsidy

likely to prevail.  See H.R. Doc. No. 103-316, vol. 1, at 890 (a

more-recently-calculated rate "may" be more appropriate); *Sunset Policy Bulletin*, 63 Fed.Reg. at 18,876, §III.B.3 (the ITA "may" make adjustments to the net countervailable subsidy, "including, but not limited to", adjusting the rate from the original investigation to reflect any increase from a more recent administrative review). Moreover, the court notes that the word "may" suggests even wider discretion than other provisions which state that the agency "normally will" or "normally will not" change the rate in a given situation. Compare id. with id. at 18,875-96, §§ III.A.1-5, III.B.1-2, III.C.1-2. In any event, the court cannot agree with plaintiffs' assertion that the ITA's failure to make the desired adjustment violated the statute.

While the ITA's discretion is not unfettered, this court does not find that the agency's unwillingness to adjust the net subsidy to reflect more recent administrative reviews was arbitrary, capricious, or an abuse of discretion. The ITA has interpreted section III.B.3(d) of the *Sunset Policy Bulletin* more narrowly than its language suggests, exercising discretion not where the subsidy has been increased "for any reason" but rather where there has been "a consistent pattern of increased usage" over the life of the order. See, e.g., Final Results of Full Sunset Review: Industrial Phosphoric Acid From Israel, 65 Fed.Reg. 6,163, 6,164-65 (Feb. 8, 2000).

The record does not reflect such a consistent pattern with regard to the programs at issue herein. In their brief, the plaintiffs present comprehensive charts illustrating the subsidy rates found for each exporter and program based on the agency's final determinations over time. While there has naturally been some variance in the rates, including increases, there has been no "consistent pattern of increased usage" for any of the programs that were included in the net countervailable subsidy reported to the ITC. For example, the ITA first countervailed a program described as an "Exemption of Export Credit From Interest Taxes" in the 1993 period of review. See Certain Iron-Metal Castings From India: Final Results of Countervailing Duty Administrative Review, 61 Fed.Reg. 64,676, 64,677 (Dec. 6, 1996). The final results of that review included a rate of zero for two individual companies and a program rate of 0.06 percent. Id. While the rates for some companies did increase over the two subsequent administrative reviews, other exporters saw their rates return to 0.06, or even drop from 0.06 to zero. See Certain Iron-Metal Castings From India; Final Results and Partial Rescission of Countervailing Duty Administrative Review, 63 Fed.Reg. 64,050, 64,051 (Nov. 18, 1998); Certain Iron-Metal Castings From India; Final Results of Counter-vailing Duty Administrative Review, 62 Fed.Reg. 32,297, 32,298 (June 13, 1997). Other programs, such as "Preferential Post-Shipment Export Financing", experienced even more fluctuation, with

rates for most exporters rising and falling several times over the life of the order before settling at or near zero in the more recent reviews. See, e.g., Certain Iron-Metal Castings From India: Notice of Preliminary Results of Countervailing Duty Administrative Review, 60 Fed.Reg. 4,591, 4,593-94 (Jan. 24, 1995); 61 Fed.Reg. at 64,677; 62 Fed.Reg. at 32,298; 63 Fed.Reg. at 64,050-51. In short, the record evidence does not reveal a consistent pattern of increasing countervailable benefits over the life of the order.[11] And finding a rational connection between the facts found and the choices made in the agency's methodology for determining the net countervailable subsidy, the court cannot conclude that remand is necessary for reconsideration of this issue.

## II

In the light of the foregoing, the court concludes that plaintiffs' motion for judgment upon the agency record must be, and it hereby is, granted to the extent of remand to the defendant for reconsideration of the subtraction of IPRS from the net counter-vailable subsidy without having considered the method of that program's alleged termination or the likelihood of its reinstate-ment in the absence of any prior administrative determination of

---

[11] The court notes that, upon reconsideration of the IPRS program, the agency may come to conclude that there is insufficient evidence of termination to support its previous subtraction of IPRS from the net subsidy rate. If the ITA determines that IPRS should continue to be counted, it should also determine whether any adjustments are thereby warranted.

that issue.  In all other respects, plaintiffs' motion must be, and it hereby is, denied[12].

        The defendant may have 45 days for such reconsideration in accordance with this opinion and to report the results thereof to the court, whereupon the plaintiffs may comment thereon within 15 days.

        So ordered.

Decided:  New York, New York
          April 2, 2001

                                      _____
                                         Judge

---

[12] Plaintiffs' accompanying motion for oral argument is also hereby denied, given the quality of the written submissions on both sides.