Slip Op. 00 - 7

UNITED STATES COURT OF INTERNATIONAL TRADE

```
- - - - - - - - - - - - - - - - - - - x
NEENAH FOUNDRY CO.; ALHAMBRA FOUNDRY
INC.; ALLEGHENY FOUNDRY CO.; DEETER   :
FOUNDRY INC.; EAST JORDAN IRON WORKS,
INC.; LEBARON FOUNDRY INC.; MUNICIPAL :
CASTINGS, INC.; and U.S. FOUNDRY &
MANUFACTURING CO.,                    :
                        Plaintiffs,      Court No. 99-07-00441
                                      :
            v.
                                      :
THE UNITED STATES,
                                      :
                        Defendant.
- - - - - - - - - - - - - - - - - - - x
```

Opinion & Order

[Plaintiffs' application for preliminary injunction,
 continuing suspension of liquidation pending judi-
 cial resolution of complaint(s) regarding agency
 "sunset" review(s) of countervailing-duty order,
 denied.]

Dated: January 20, 2000

Collier, Shannon, Rill & Scott, PLLC (Paul C. Rosenthal, Robin H. Gilbert and Grace W. Kim) for the plaintiffs.

David W. Ogden, Acting Assistant Attorney General; David M. Cohen, Director, and Velta A. Melnbrencis, Assistant Director, Commercial Litigation Branch, Civil Division, U.S. Department of Justice; and Office of Chief Counsel for Import Administration, U.S. Department of Commerce (Robert E. Nielsen), of counsel, for the defendant.

Cameron & Hornbostel LLP (Dennis James, Jr. and Michele Sherman Davenport) for Bengal Export Corporation, Carnation Industries Limited, Commex Corporation, Crescent Foundry Company Private Limited, Dinesh Brothers Private Limited, Kajaria Iron Castings Ltd., Kiswok Industries Pvt. Ltd., Nandikeshwari Iron Foundry Pvt. Ltd., Rangilal & Sons, R.B. Agarwalla & Company, RSI Limited, Serampore Industries Pvt. Ltd., and Victory Castings Limited, proffered intervenor-defendants.

AQUILINO, Judge:  Claiming their current circumstances give rise to an issue of first impression, come now the plain-

tiffs with an application to enjoin the International Trade Administration, U.S. Department of Commerce ("ITA") from instructing the Customs Service to discontinue suspension of liquidation and collection of cash deposits on and after January 1, 2000 for entries of merchandise theretofore within the ambit of Certain Iron Metal Castings From India: Countervailing Duty Order, 45 Fed.Reg. 68,650 (Oct. 16, 1980), per the ITA notice of its revocation published November 12, 1999, 64 Fed.Reg. 61,602.

I

This action derives from the "Uruguay Round" negotiations under the guise of the General Agreement on Tariffs and Trade, which resulted in multilateral agreements, including one on subsidies and countervailing measures, and which in turn led the U.S. Congress to enactment of the Uruguay Round Agreements Act, Pub. L. No. 103-465, 108 Stat. 4809 (Dec. 8, 1994). Section 220 thereof amended section 751 of the Trade Agreements Act of 1979, 19 U.S.C. §1675, to require that

> 5 years after the date of publication of . . . a countervailing duty order . . . the [ITA] and the [International Trade] Commission . . . conduct a review to determine . . . whether revocation of . . . [such] order . . . would be likely to lead to continuation or recurrence of . . . a countervailable subsidy . . . and of material injury.

19 U.S.C. §1675(c)(1) (1995). Such five-year or "sunset" reviews are to be conducted pursuant to section 752, which was added to the 1979 act by section 221 of Pub. L. No. 103-465, 19 U.S.C. §

1675a (1995) (Special Rules for Section 751(b) and 751(c) Re-
views).  Both the ITA and the Commission ("ITC") have now done
so with regard to the above-cited 1980 countervailing-duty order.
In its Amended Final Results of Expedited Sunset Review: Iron
Metal Castings From India, 64 Fed.Reg. 37,509, 37,511 (July 12,
1999), the ITA continued

> to find that revocation of the countervailing duty
> order would be likely to lead to continuation or re-
> currence of a countervailable subsidy at the rates
> listed in the Department's final determination of
> the sunset review of this case[,]

citing Final Results of Expedited Sunset Review: Iron Metal Cast-
ings From India, 64 Fed.Reg. 30,316 (June 7, 1999).  Nonetheless,
the above-named plaintiff domestic U.S. manufacturers of compet-
ing merchandise commenced this action, alleging in their com-
plaint, among other things, that the agency's determination of
certain subsidy rates is "erroneous, being significantly under-
stated."  Complaint, para. 8.

Subsequent to publication of that determination, which
entailed margins ranging from 0.84 to 1.82 percent[1], the ITC came
to conclude (over the dissent of two commissioners) that

> revocation of the countervailing duty order on iron
> metal castings from India would not be likely to lead
> to continuation or recurrence of material injury to
> an industry in the United States within a reasonably
> foreseeable time[2,]

---

[1] See 64 Fed.Reg. at 30,320.

[2] Iron Metal Castings From India; Heavy Iron Construction
Castings From Brazil; and Iron Construction Castings From Brazil,
Canada, and China, 64 Fed.Reg. 58,442 (Oct. 29, 1999).

given the magnitude of those rates[3], among other factors.  See,
e.g., Iron Metal Castings From India; Heavy Iron Construction
Castings From Brazil; and Iron Construction Castings From Brazil,
Canada, and China, USITC Pub. 3247, p. 13 (Oct. 1999).  Whereupon
the ITA notice of revocation, supra, issued -- and caused the
plaintiffs to interpose their application for a preliminary in-
junction, which the court finds timely, and in which they contend
that, in the absence of this immediate relief,

> the domestic industry will forfeit its right to ob-
> tain judicial review and the full benefit of a favor-
> able ruling by this Court.

Plaintiffs' Motion for Preliminary Injunction, p. 2.


## II

Both before and during a hearing in open court, the
application was opposed by the defendant[4], notwithstanding such

---

[3] The Trade Agreements Act, as amended, provides that, in
making a revocation determination, the Commission "may consider
. . . the magnitude of the net countervailable subsidy."  19
U.S.C. §1675a(a)(6) (1995).

[4] Opposition was also presented in the form of a motion by
Bengal Export Corporation, Carnation Industries Limited, Commex
Corporation, Crescent Foundry Company Private Limited, Dinesh
Brothers Private Limited, Kajaria Iron Castings Ltd., Kiswok
Industries Pvt. Ltd., Nandikeshwari Iron Foundry Pvt. Ltd., Ran-
gilal & Sons, R.B. Agarwalla & Company, RSI Limited, Serampore
Industries Pvt. Ltd., and Victory Castings Limited for leave to
intervene as parties defendant as a matter of right within the
meaning of CIT Rule 24(a) or, in the alternative, permissively
under Rule 24(b) for the "limited role of opposing plaintiffs'
Motion".

The motion could not be granted by the court, given its
governing statute, 28 U.S.C. §2631(j)(1)(B), to the effect that,
in an action such as this brought pursuant to 28 U.S.C. §1581(c),

(footnote continued)

relief in regular course in cases reviewing administrative determinations pursuant to section 751 of the Trade Agreements Act of 1979, as amended.  See, e.g., Zenith Radio Corp. v. United States, 710 F.2d 806 (Fed.Cir. 1983); Fenton Corporation v. United States, CIT No. 00-01-00014 (preliminary injunction entered  Jan. 11, 2000).

Be Zenith and the innumerable cases that have followed it as they have been, in the absence of government consent in this action, the plaintiffs properly recognize in their papers that this court

> must consider four factors in determining whether to grant . . . an injunction: (1) whether the movant will suffer irreparable harm if the relief is not granted; (2) whether the movant is likely to succeed on the

---

> only an interested party who was a party to the proceeding in connection with which the matter arose may intervene, . . . as a matter of right[.]

Here, the record shows that the afore-named movants waived any right to participate in the five-year review before the ITA, the results of which are the predicate of this action. See Motion to Intervene as Defendants-Intervenors, p. 2.  See also 64 Fed.Reg. at 30,318 (Background).

Furthermore, subsections (a) and (b) of CIT Rule 24 are both premised upon "timely application", which the former defines for an action like this as "no later than 30 days after the date of service of the complaint".  That date herein was July 23, 1999, while the motion to intervene was only filed after the ITC determination - on December 9, 1999.  In fact, by that time, those firms had properly obtained leave to intervene as parties defendant in the action contesting that agency determination, CIT No. 99-11-00716.

In any event, while participation by those parties in the proceedings before that agency, albeit related to those under review herein, could not be, and therefore was not, equated with "good cause", as defined in Rule 24(a), their counsel was heard herein amicus curiae.

merits; (3) whether an injunction will be contrary to the public interest; and (4) whether the balance of hardships tips in the movant's favor.  . . .  No one factor, taken individually, is necessarily dispositive. . . . The weakness of the showing regarding one factor may be overborne by the strength of the others.  . . .

Plaintiffs' Motion for Preliminary Injunction, pp. 2-3. See FMC Corporation v. United States, 3 F.3d 424, 427 (Fed.Cir. 1993), and cases cited therein.  Cf. 19 U.S.C. §1516a(c)(2).

A

The papers contain a supporting affidavit from the Vice President of Construction Products Sales and Engineering for plaintiffs Neenah and Deeter foundry companies. It avers, in part, that:

6. Prior to the commencement of the sunset proceedings concerning the 1980 CVD Order, prices of imported castings from India averaged approximately 17.5 cents per pound, based on the floor price estab-lished by the Indian Engineering Export Promotion Council ("EEPC").  The EEPC sets the minimum export price primarily to keep the Indian producers from competing with each other . . ..  In the past, in addition to the existence of a floor price mecha-nism, there was less competition among importers as well because their pricing was dictated by dif-ferent cash deposit rates that were in effect. If the Order is revoked, Indian producers will no longer have CVD duties assessed on their products. Importers, therefore, will no longer have to pay these CVD duties.  This means that all Indian producers will be on equal footing, in that coun-tervailing duties will not be collected on any of their exports, and importers will have even greater flexibility in choosing which exports to purchase. They will purchase primarily on the basis of price, since these products are commodity goods.  With even more exporters to choose from, importers will be able to seek even lower prices for these goods. They, in turn will compete even more fiercely with each other as well as against domestic producers. This increased competition will cause prices to spiral downward.

7. The industry has already witnessed first-hand the effect of the pending revocation. In a bid for manhole castings solicited by the City of Des Moines, G.C.I. Castings, which to the best of my knowledge imports exclusively Indian castings, was the lowest bidder by a substantial margin. . . . The disparity in pricing between the Indian importer and the three other bidders, including Neenah, was drastic. Price differentials were as high as 71 percent. In a fixed price, sealed bid procurement, which is typical in our industry, the bidder with the best price is almost always the awardee. Thus, it is very likely that the domestic industry will lose this contract, which would be a loss of approximately $49,000.00 in revenue.

8. The selling practice of G.C.I. Castings, which is described in paragraph 7, is not an isolated incident. Following the Commission's negative determination, other importers of Indian castings have begun positioning themselves differently than they have traditionally, cutting their prices further in order to gain U.S. market share. In fact, many of these importers have begun offering below-market prices to our existing customers.

*   *   *

11. Sigma is another importer of Indian castings. To the best of my knowledge, a large percentage, if not all, of Sigma's imports consist of Indian castings. Presently, both G.C.I. Castings and Sigma are actively contacting our existing customers in the Midwest region and quoting them prices for heavy Indian castings which are 10 to 30 per cent lower than Deeter's prices. Based on a sample of companies that we have contacted, more than a dozen have already received offers for Indian castings at extremely reduced prices. . . .

12. The foregoing examples of the recent extremely aggressive pricing by these importers demonstrates that revocation of the Order will cause a rapid loss of domestic market share for the U.S. heavy castings industry. Within one month after the Commission's negative determination, our company has already lost significant sales to importers of Indian castings. If the Order is revoked, we can project with reasonable certainty that our company will lose either all or most of the high volume,

"local standards" castings market, which would reduce Neenah's revenue and profit . . . and . . . Deeter's revenue and profit . . ..

13. Based on my extensive experience in the heavy castings industry, I can attest that heavy castings are generally viewed as a commodity product and that price is the most important factor in purchasing decisions. In particular, the high volume market, municipal bids, and large purchasers will likely choose the unfair imports over domestic castings. As the largest domestic supplier of heavy castings, which includes approximately half of the high volume, "local standards" castings, Neenah Foundry has already felt the effect of the lower-priced Indian imports. As most of the products produced by Deeter and the remaining domestic producers are considered to be local standard, heavy castings, I strongly believe that revocation of the Order would place most of the domestic producers' product line in jeopardy of being attacked by aggressively lower-priced imports. Thus, Deeter and the remaining domestic producers will likely suffer even greater losses in revenue to Indian importers. These lost sales will further reduce domestic market share, decrease production, profits and cash flow, making funds unavailable for necessary capital expenditures and product development.

14. Finally, I am very familiar with the heavy castings industry in India and can attest that Indian producers have significant underutilized capacity to produce heavy castings. In fact, this was recently confirmed by the International Trade Commission, which determined that Indian producers were operating at only half their capacity. (See Final Staff Report dated September 29, 1999 at IV-13.) Thus, I strongly believe that unfair imports from India can and will increase significantly if the order is revoked and therefore cause irreparable harm to the domestic industry.

Plaintiffs' Motion for Preliminary Injunction, Exhibit E (Nov. 22, 1999). In addition, counsel called to the witness stand at the hearing the General Manager of Sales for plaintiff East Jordan Iron Works, Inc., whose testimony was generally supportive of the foregoing. He claimed that competition from Indian exports

in the heavy-castings market has already increased substantially, at least in one area of the United States, referring to two distributors in a major city which allegedly have switched to imports from India. His company is thus not now selling to them due to pricing beneath domestic cost of production. While admitting that some business had been lost prior to the ITA notice of revocation, the witness claimed that it has become more difficult to sell domestic castings since then, and the difficulties faced by East Jordan Iron Works in that one market hub may occur in other regions due to consolidation of distribution channels. He also pointed out that at least one new importer has entered the market since the revocation.

This testimony has not been refuted. While some of it is nonetheless speculative, given the recentness of the agency decision(s) contested herein, no one can deny the speed with which news thereof in Washington is known in Calcutta, and throughout the world of international trade. Such dispatch can and does cause harm sufficient to satisfy the standard for federal judicial relief. But economic injury of the kind the plaintiffs point to already herein is not necessarily "irreparable". See, e.g., American Stevedoring Inc. v. United States Customs Service, 18 CIT 331, 335, 852 F.Supp. 1067, 1071 (1994), citing Sampson v. Murray, 415 U.S. 61 (1974); Wisconsin Gas Co. v. Federal Energy Regulatory Comm'n, 758 F.2d 669 (D.C. Cir. 1985); Arbor Foods, Inc. v. United States, 8 CIT 355, 600 F.Supp.

217 (1984). And it is that degree of harm that is necessary for issuance of the immediate extraordinary equitable relief which is a preliminary injunction. On the record developed by the plaintiffs, this court cannot and therefore does not find that their injury is irreparable.

They place heavy emphasis on Zenith Radio Corp. v. United States and FMC Corporation v. United States, supra. In the later case, involving an ITA administrative review of an antidumping-duty order and resultant determination to revoke pursuant to section 751 of the Trade Agreements Act of 1979, as amended, the Court of International Trade denied the domestic plaintiffs a preliminary injunction, suspending liquidation pending judicial review, on the grounds of failure to show irreparable harm and likelihood of success on the merits. FMC Corp. v. United States, 16 CIT 378, 792 F.Supp. 1285 (1992). The court of appeals concurred as to the second ground, thereby affirming the denial of the injunction, but it agreed with the plaintiff-appellants that its prior decision in Zenith held that "liquidation of 751 entries pending appeal constitutes irreparable injury", 3 F.3d at 430, viz.:

. . . [T]he Zenith court concluded that:

> [L]iquidation would indeed eliminate the only remedy available to Zenith for an incorrect review determination by depriving the trial court of the ability to assess dumping duties on Zenith's competitors in accordance with a correct margin on entries in the '79-'80 review period.

Zenith, 710 F.2d at 810.

Furthermore, the court recognized that the harm caused by liquidating the entries at issue would not be simply economic but would extend to Zenith's statutory right to obtain meaningful judicial review of the determination.  In light of 19 U.S.C. §§ 1516a and 1516a-(c)(1) which call for immediate liquidation, the court noted:

> The statutory scheme has no provision permitting reliquidation in this case or imposition of higher dumping duties after liquidation if Zenith is successful on the merits.  Once liquidation occurs, a subsequent decision by the trial court on the merits of Zenith's challenge can have no effect on entries of television receivers during the '79-'80 review period. . . .  Not even prospective relief will be available to Zenith for entries in the '79-'80 review period once liquidation occurs.

Id.

The emphasis throughout Zenith is on the liquidation of entries for a specific review period and the potential loss of plaintiff's remedy, i.e., the right to have the administrative determination reviewed, with respect to that specific period.  . . .

3 F.3d at 430-31 (footnote omitted).

Be that as it may, the focus of the administrative proceedings pursuant to sections 751 and 752, as amended and added by the Uruguay Round Agreements Act and now at bar, is a broader timeframe.  Indeed, given plaintiffs' evidence adduced herein, the primary pricing concern is not the past, or even the present[5], but the future.  And of course, there is little evidence

---

[5] The court notes in passing that the ITA notice of revocation specifically invites "appropriately filed requests for review" pursuant to section 751 "of subject merchandise entered prior to the effective date of revocation".  64 Fed.Reg. at 61,-603.  Moreover, Congress has mandated agency expedition of new petitions filed by domestic industries in the aftermath of "sunset" revocation of countervailing-duty orders.  See 19 U.S.C. § 1671a(c)(1)(C) (1995).

before the court at this time as to what merchandise will actu-
ally enter, and then someday be liquidated by the Customs Ser-
vice, before this action has run its complete course.  Moreover,
any such liquidation following the ITA's determination to revoke
the underlying order would not preclude all meaningful relief,
as recognized by both courts in FMC.[6]  Finally, whatever the pre-
cise relief, it cannot be overlooked that the revocation herein
was based directly upon the requirement of sections 751(c) and
752 that the ITC consider the state of the domestic industry and
weigh whether or not revocation might cause it material injury.
In this instance, a majority of commissioners has found, among
other things, that

> revocation of the order with respect to heavy construc-
> tion castings from India would have no discernible ad-
> verse impact on the U.S. industry . . ..  The volume of
> subject imports from India was 61.1 million pounds in
> 1978 and 94.4 million pounds in 1979, then declined
> after issuance of the antidumping [sic] duty order in
> 1980.  Imports of the subject merchandise from India
> have now increased, notwithstanding the order, above
> pre-order levels to 118.0 million pounds in 1997 and
> 115.8 million pounds in 1998, representing 17.9 per-
> cent of apparent consumption in 1997 and 16.9 percent
> of apparent consumption in 1998.  Therefore, we find
> that the volume of the subject heavy castings imports
> from India is not likely to change to a significant
> degree as a result of revocation of the countervailing
> duty order.  While Commerce has found that the Indian
> subsidy programs constitute export subsidies as defined

---

[6] See FMC Corp. v. United States, 16 CIT 378, 381, 792 F.-
Supp. 1285, 1287 (1992), aff'd, 3 F.3d 424, 431 (Fed.Cir. 1993).
Also, it must be emphasized that in that case, unlike this one,
there were *past* entries of merchandise during the review period
in question (1989-90) clearly left exposed to liquidation without
effective judicial review.  Cf. supra, note 5; Torrington Co. v.
United States, 20 CIT 1293 (1996); Timken Co. v. United States,
11 CIT 504, 666 F.Supp. 1558 (1987).

in Article 3.1(A) of the Subsidies Agreement, it has also found that the likely countervailable subsidy would range from 0.84 percent to 1.82 percent. We find it unlikely that significant additional exports to the U.S. would therefore result if the order were revoked. Moreover, current imports from India already undersell the U.S. product by considerable margins, indicating that removal of the countervailing duty order would not have an increased significant adverse price effect on the domestic like product.  The effect of any small additional amounts of subject imports from India would be further attenuated by the fact that some portion of the U.S. market is governed by Buy American restrictions, and by the somewhat limited substitutability of the Indian product with the U.S. domestic like product. Accordingly, we find that removal of the order with respect to India will have no discernible adverse impact upon the U.S. industry.

USITC Pub. 3247, pp. 12-14 (footnotes omitted).

B

As indicated, the plaintiffs have also filed a complaint, contesting this ITC determination, which is yet to be briefed and then reviewed by the courts.  For the moment, however, the decision not only diminishes plaintiffs' injury due to any error on the part of the ITA, it also tends to undermine any requisite showing of likelihood of success on the merits. That is, in making an initial assessment of such probability, the court must consider the determinations of both agencies, given the regime enacted by Congress for "sunset" reviews. Here, the court is unable to conclude that affirmance of plaintiffs' specifications of ITA error would lead the ITC to vacate its negative material-injury determination.  Those specifications are that (1) the ITA erroneously found that two subsidy programs in India, the International Price Reimbursement Scheme ("IPRS")

and the Cash Compensatory Support program ("CCS"), were termi-
nated in full; (2) the agency's finding with regard to IPRS was
due to faulty procedure, which failed to produce substantial
supporting evidence on the record; (3) the evidence as to CCS
does not show actual termination -- by implementing statute,
regulation or decree; (4) the ITA's findings as to both were
not verified, as mandated by the governing statute; and (5) the
agency ignored the history of the subsidy programs, erroneously
opting for rate(s) determined from its first review of the coun-
tervailing-duty order pursuant to section 751 rather than the
rates developed over time.  See Plaintiffs' Motion for Prelimi-
nary Injunction, pp. 17-19.  It is claimed that, if the

> plaintiffs prevail on the merits of the[se] methodolo-
> gical issues, the net countervailable subsidy found by
> Commerce could increase substantially, from less than
> two percent to double- or even triple-digit margins.

Id. at 19 n. 16.  This may prove to be the case, but at this
stage of the action, given plaintiffs' brief at bar[7], the court
does not discern a substantial likelihood thereof.

Moreover, if plaintiffs' position *vis-á-vis* the ITA
proves well-founded, an ITC reversal of direction would not be
*a fortiori*.  To be sure, as quoted above, the commissioners took
note of the margins published by the ITA, as permitted by section

---

[7] Cf. Plaintiffs' Motion for Preliminary Injunction, p. 19
n. 16 ("These methodological issues will be fully addressed in
plaintiffs' motion for judgment upon the agency record pursuant
to USCIT R. 56.2").

752, 19 U.S.C. §1675a(a)(6) (1995), but they were not the only

factor for Commission consideration, or necessarily the most im-

portant.  Compare ibid. with subsections (a)(2) (Volume), (a)(3)

(Price), (a)(4) (Impact on the industry), and (a)(5), which sets

forth the basis for determination as follows:

> The presence or absence of any factor which
> the Commission is required to consider . . . shall
> not necessarily give decisive guidance with respect
> to the Commission's determination of whether material
> injury is likely to continue or recur within a reason-
> ably foreseeable time if the order is revoked . . ..

Nevertheless, the plaintiffs contend in regard to the

ITC that, because its

> determination was made by a vote of 4 in the nega-
> tive and 2 in the affirmative, a change in one com-
> missioner's decision from negative to affirmative
> would result in continuation of the CVD order. See
> 19 U.S.C. §1677(11).

> A change in one or more commissioners' decisions
> could arise as a result of an upward increase in the
> countervailing duty rate found by Commerce in at least
> two respects.  First, all of the commissioners voting
> in the negative mentioned that their respective deter-
> minations not to cumulate Indian heavy castings with
> the other subject merchandise were tied to the low
> margins ascribed by Commerce to the Indian imports.
> Second, the Commission majority found it unlikely that
> significant additional exports to the United States
> would occur as a result of revocation of the order,
> given Commerce's finding that the likely countervail-
> able subsidy would range from 0.84 to 1.82 percent.
> This finding was central to the majority's determi-
> nation that revocation of the Indian CVD order would
> not be likely to lead to continuation or recurrence
> of material injury to the domestic industry within a
> reasonably foreseeable time.  This case thus presents
> significant grounds, as in Borlem, for the Court to
> find that remand to the ITC is appropriate if Com-
> merce's net countervailable subsidy calculation in-
> creases pursuant to this litigation, so that the
> ITC may reconsider its determination in light of the
> new information.

Plaintiffs' Motion for Preliminary Injunction, pp. 38-40 (foot-

notes omitted).  Indeed, the case cited, namely, <u>Borlem S.A. -</u>

<u>Empreedimentos Industriais v. United States</u>, 913 F.2d 933 (Fed.

Cir. 1990), <u>aff'g</u>, 13 CIT 535, 718 F.Supp. 41 (1989), does stand

for the proposition that the Commission has the authority, if

not obligation, to reconsider its determination in the light of

correction of a related determination of the ITA.  And this court

does not doubt its jurisdiction, or that of the two agencies, in

this regard, but only after thorough parsing at bar of the claims

for correction, which is not yet possible.

     The plaintiffs also focus herein on the views of one

of the four commissioners voting in the negative majority, in

particular, that the ITC

> is <u>precluded</u> from exercising [it]s discretion [to cum-
> ulate] if the imports from a country subject to review
> are likely to have "no discernible adverse impact on
> the domestic industry" upon revocation of the order.
> 19 U.S.C. §1675a(a)(7).  Thus, under this provision,
> the Commission must find that the subject imports from
> a country will have a "discernible adverse <u>impact on</u>
> <u>the domestic industry</u>" after revocation of the order
> before cumulating those imports with other subject
> imports.

USITC Pub. 3247, p. 10 n. 52 (emphasis in original).  In assert-

ing that the three other members "have applied the statute prop-

erly"[8], the plaintiffs claim the illogic of the above approach

"truly stand[s] the cumulation provision on its head."  Plain-

---

     [8] <u>Id</u>. at 43.

tiffs' Motion for Preliminary Injunction, p. 42.  This may be true, given its language[9], legislative history and administrative interpretation, but, again, there is no guarantee under the whole statutory regime, supra, that a different approach to this one factor would at least deadlock the commissioners, and thereby continue the long-standing ITC affirmative material-injury determination.

C

To address briefly, which is all the plaintiffs do[10], the remaining two considerations for issuance of a preliminary injunction, namely, the public interest and the hardships grant or denial might entail, the court readily concurs that

> the public interest is best served by ensuring that
> Commerce and the ITC comply with the law, and that

---

[9] As enacted by Congress in the Uruguay Round Agreements Act, Pub. L. No. 103-465, §221(a), 108 Stat. 4809, 4867 (1994), it stated:

> (7) CUMULATION.-- For purposes of this subsection, the Commission may cumulatively assess the volume and effect of imports of the subject merchandise from all countries with respect to which reviews under section 751(b) or (c) were initiated on the same day, if such imports would be likely to compete with each other and with domestic like products in the United States market.  The Commission shall not cumulatively assess the volume and effects of imports of the subject merchandise in a case in which it determines that such imports are likely to have no discernible adverse impact on the domestic industry.

See 19 U.S.C. §1675a(a)(7) (1995).

[10] See, e.g., Plaintiffs Motion for Preliminary Injunction, pp. 44-46.

they interpret and apply laws and regulations cor-
rectly.[11]

It does not appear at this threshold, however, that either has

committed the kind of error which warrants immediate, extraor-

dinary, equitable relief.  Furthermore, reinstating forthwith

the *status quo ante*, for which the plaintiffs pray, could well

tend to undermine the results of the difficult negotiations

which led to the Uruguay Round agreements[12] and also the commit-

ments of the United States at the World Trade Organization.  Cf.,

e.g., Washington Tariff & Trade Letter, Many CVD Orders May Face

Challenge in Wake of WTO Ruling, p. 3 (Jan. 3, 2000).  In short,

the plaintiffs fail to persuade this court that the equities they

implicate tip decidedly in their favor.


                              III

        In view of the foregoing discussion of plaintiffs'

failure to bear their burden of persuasion on the prerequisites

for immediate relief, their application for a preliminary injunc-

tion must be, and it hereby is, denied.  Given this required de-

cision on the record developed, which does intimate concern on

the part of the plaintiffs that judicial review and any neces-

sary, resultant, further administrative proceedings could con-

sume, in regular course, much time -- free of the long-standing

countervailing-duty order, the parties in this and the related

---

    [11] Id. at 44.

    [12] See generally Terence P. Stewart, The GATT Uruguay Round -
A Negotiating History (1986-1992)- Volume I: Commentary (1993).

action, CIT No. 99-11-00716, are hereby invited to present the genuinely-dispositive issues in an expeditious manner.

So ordered.

Dated:  New York, New York
        January 20, 2000


                                    _____
                                                Judge