**Slip Op. 02-87**

# UNITED STATES COURT OF INTERNATIONAL TRADE

———————————————————————

|  |  |  |
|---|---|---|
| CORUS GROUP PLC, CORUS UK Ltd., CORUS STAAL BV, CORUS PACKAGING PLUS NORWAY AS, CORUS STEEL USA INC., and CORUS AMERICA INC., | : | |
| | : | |
| Plaintiffs, | : | |
| | : | |
| v. | : | |
| | : | |
| George W. BUSH, President of the United States, Robert C. BONNER, Commissioner, United States Customs Service, and THE UNITED STATES INTERNATIONAL TRADE COMMISSION, | : | |
| | : | Court No. 02-00253 |
| Defendants, | : | **Public Version** |
| | : | |
| and | : | |
| | : | |
| WEIRTON STEEL CORP., | : | |
| | : | |
| Defendant-Intervenor,. | : | |
| | : | |
| and | : | |
| | : | |
| BETHLEHEM STEEL CORP., NATIONAL STEEL CORP, and UNITED STATES STEEL CORP. | : | |
| | : | |
| Defendant-Intervenors. | : | |

———————————————————————

[Motion for preliminary injunction denied. Partial summary judgment for defendants.]

Dated: August 9, 2002

Steptoe & Johnson LLP (Richard O. Cunningham, Peter Lichtenbaum, and Arun Venkataraman) for plaintiffs.

Robert D. McCallum, Jr., Assistant Attorney General, David M. Cohen, Director, Lucius B. Lau, Assistant Director, Commercial Litigation Branch, Civil Division, United States Department of Justice, for defendants George W. Bush, President of the United States, and Robert C. Bonner, Commissioner, United States Customs Service.

Lyn M. Schlitt, General Counsel, James M. Lyons, Deputy General Counsel, United States International Trade Commission (Mary Elizabeth Jones and Mark B. Rees), for defendant United States International Trade Commission.

Schagrin and Associates (Roger B. Schagrin) for defendant-intervenor Weirton Steel Corporation.

Skadden, Arps, Slate, Meagher, & Flom LLP (Robert E. Lighthizer, John J. Mangan, James C. Hecht) for defendant-intervenors Bethlehem Steel Corporation, National Steel Corporation, and United States Steel Corporation.

## OPINION

**RESTANI, Judge:**

This matter is before the court on Plaintiffs' motion for preliminary injunctive relief pursuant to USCIT R. 65(a). Plaintiffs Corus Group PLC, Corus UK Ltd., Corus Staal BV, Corus Packaging Plus Norway AS, Corus Steel USA Inc., and Corus America Inc. (collectively "Corus") seek preliminary injunctive relief to enjoin Defendant United States Customs Service ("Customs") from (1) collecting additional duties imposed on Plaintiffs' tin mill product imports, as of March 20, 2002, pursuant to the President's March 5, 2002 Steel Products Proclamation; (2) liquidating any and all unliquidated entries of Plaintiffs' tin mill products that have entered and will continue to enter the United States; and (3) taking any other action regarding Plaintiffs' tin mill products. The International Trade Commission ("ITC" or "Commission") moves to dismiss for lack of jurisdiction pursuant to USCIT R. 12(b)(2) and for failure to state a claim pursuant to USCIT R. 12(b)(5). Defendants George W. Bush, President of the United States, and

Robert C. Bonner, Customs Commissioner (collectively the "Administration") filed a separate

motion to dismiss for failure to state a claim or, in the alternative, a Rule 56 motion for summary

judgment.[1]  Corus filed a cross-motion for summary judgment.

## BACKGROUND

On March 7, 2002, the President of the United States issued a proclamation pursuant to

Section 201, et seq., of the Trade Act of 1974 ("Act").  Proclamation No. 7529 - To Facilitate

Positive Adjustment to Competition From Imports of Certain Steel Products, 67 Fed. Reg. 10553

(March 7, 2002) ("§201 Proclamation").  The President imposed safeguard measures to

counteract serious injury, or the threat of serious injury, found by the ITC.  With respect to

certain tin mill products, the President imposed an ad valorem duty increase of thirty (30) percent

for the first year of the § 201 remedies.[2]  Corus is, among other things, a foreign producer of tin

mill products.

Corus challenges the invocation of § 201 safeguard provisions on three grounds: (1) that

the ITC votes supporting an affirmative injury determination were improperly counted with

respect to tin mill products ("Count I"); (2) that Commissioner Dennis M. Devaney was not a

legal member of the ITC at the time of his vote because there was not an ITC vacancy at the time

of his appointment ("Count II"); and (3) that Commissioner Devaney was not a legal member of

the ITC at the time of his vote because he was not lawfully appointed by then President William

Jefferson Clinton ("Count III").  Corus seeks a preliminary injunction to enjoin enforcement of

---

[1]  The ITC concurs in the alternative motion for summary judgment filed by the Administration.  ITC Br. at 27.

[2]  Duties decrease over the final two years of the remedial period.  §201 Proclamation at ¶ 9(b).

the resulting duty increase and to prevent liquidation of all present and future unliquidated entries

of Corus's tin mill products.  Defendants collectively oppose injunctive relief.

For the purposes of this opinion, the court has consolidated Plaintiffs' Motion for

Preliminary Judgment with the ITC's motion to dismiss for lack of jurisdiction and Count I on

the merits (ITC's method of counting votes).

## DISCUSSION

### I.  Jurisdiction

As an initial matter, the ITC moves to dismiss on grounds that the court lacks jurisdiction

to review Counts II and III.[3]  Section 1581(i) provides in relevant part that the court:

> shall have exclusive jurisdiction of any civil action commenced against the United States, its agencies, or its officers, that arises out of any law of the United States providing for--
> . . .
> (2) tariffs, duties, fees, or other taxes on the importation of merchandise for reasons other than the raising of revenue.
> . . .
> (4)administration and enforcement with respect to the matters referred to in paragraphs (1)-(3) of this subsection and subsections (a)-(h) of this section.

28 U.S.C. § 1581(i) (2000).  The ITC argues that the issue of whether Commissioner Devaney

was properly appointed involves questions of Presidential power and, therefore, falls outside the

jurisdiction of the court.[4]  The Commission's position ignores the fact that this claim arises in the

---

[3]  The ITC concedes jurisdiction as to Count I.  The Administration does not dispute jurisdiction under any count.

[4]  Although the court is not bound by the decision of a co-equal court, another judge of the court has already determined that review of Commissioner Devaney's status is appropriate under § 1581(i).  Nippon Steel Corp. v. United States, Slip Op. 01-153 (Ct. Int'l Trade Dec. 28, 2001) (challenge to ITC sunset review injury determination).

context of a suit challenging the imposition of tariffs.[5]  Plaintiffs' claim that § 201 safeguards are invalid because of an improperly seated Commissioner clearly raises issues regarding whether the ITC properly carried out the laws providing for tariffs, duties, fees, or other taxes on the importation of merchandise and whether such laws are properly administered.  Accordingly, the court has jurisdiction pursuant to 28 U.S.C. § 1581(i).

## II.      ITC's Method of Counting Votes

Corus argues that, although the ITC presented an "equally divided" affirmative injury determination to the President, the ITC vote was neither affirmative nor divided with respect to tin mill products.  Under Section 202(b) of the Act, the Commission must determine "whether an article is being imported into the United States in such increased quantities as to be a substantial cause of serious injury, or the threat thereof, to the domestic industry producing an article like or directly competitive with the imported article."  19 U.S.C. § 2252(b)(1)(A) (2000).[6]   In order to render its injury determination, the Commission undertakes an investigation upon the filing of: (1) a domestic injury petition; (2) an executive branch referral; (3) a resolution of either the Committee on Ways and Means of the House of Representatives or the Committee on Finance of the Senate; or (4) on its own motion.  Id.  In this case, both the United States Trade Representative and Senate Committee on Finance requested an investigation of certain steel

---

[5]  The ITC argues that, because most of the discovery in Nippon involved White House documents, the court should acknowledge that the subject matter does not involve matters regarding international trade.  The court finds the ITC's argument relying on the location of documents unpersuasive.

[6]  For the purposes of this action, Plaintiffs do not challenge the role of the Commission or its factual determinations.  Plaintiffs do not challenge the exercise of discretion granted to the President.

products.[7] USTR Request to Initiate Section 202 Investigation, (June 22, 2001),

http://www.usitc.gov/steel/ER0622Y1.pdf (last visited August 9, 2002); Resolution directing the

International Trade Commission to make an investigation into certain steel imports under section

201 of the Trade Act of 1974 (July 26, 2001), http://www.senate.gov/~finance/steelresolution.pdf

(last visited August 9, 2002).

Six Commissioners participated in the underlying investigation at issue here.

Commissioners Koplan, Okun, Hillman, and Miller determined that the U.S. tin mill producers

constitute the industry producing articles "like or directly competitive with the imported article,

tin mill steel." Steel, Inv. No. TA-201-73, USITC Pub. 3479 Vol. I, at 48-49 & 71 n.367 (Dec.

2001) (hereinafter "Determination"). Of these four, only Commissioner Miller determined that

imports of tin mill products caused serious injury to the U.S. tin mill industry. Id. at 74 & n.402.

Two Commissioners adopted a broader definition of the domestic industry and the like

product corresponding to the subject imported merchandise. Commissioner Bragg identified the

domestic industry as U.S. producers of carbon and alloy flat products. Id. at 272-73.

Commissioner Devaney identified the domestic industry as U.S. producers of flat-rolled steel

products. Id. at 36 n.65 & 45 n.137. Tin mill products are a sub-set of the larger product

categories identified by Commissioners Bragg and Devaney. See ITC Staff Report, Vol. II,

Tables FLAT-3 & FLAT 10. Both Commissioners found that imports of products in larger

---

[7] The steel products covered by the request included: (1) certain carbon and alloy flat products; (2) certain carbon and alloy long products; (3) certain carbon and alloy pipe and tube products; and (4) certain stainless steel and alloy tool steel products. USTR Request at Attachment I. The specific products and exceptions identified are numerous and can be found within the request. The tin mill products at issue here fall within HTS subheadings 9903.73.37 through 9903.73.39.

categories caused serious injury to the domestic industry.

The Commission combined the affirmative votes of Commissioners Bragg and Devaney on the broader categories with that of Commissioner Miller on tin mill products and, pursuant to 19 U.S.C. § 2252(f), reported to the President that it was "equally divided" with respect to tin mill products.[8] Determination at 1 n.1. 19 U.S.C. § 1330(d)(1) provides that the President may consider an equally divided vote of the Commission to be either an affirmative determination or a negative determination.[9] The President elected to adopt the affirmative injury determination, § 201 Proclamation at ¶ 4, and, pursuant to § 2253(a)(1)(A),[10] granted relief to the domestic tin

---

[8] The Commission explained its determination as follows:

Chairman Koplan, Vice Chairman Okun, and Commissioner Hillman determine that carbon and alloy tin mill products are not being imported into the United States in such increased quantities as to be a substantial cause of serious injury; Commissioners Bragg, Miller, and Devaney make an affirmative determination regarding imports of carbon and alloy tin products.

Determination at 25.

[9] 19 U.S.C. § 1330(d)(1) provides, in relevant part, that:

In a proceeding in which the Commission is required to determine . . . under [section 2252 of this title,] whether increased imports of an article are a substantial cause of serious injury, or the threat thereof, as described in subsection (b)(1) of that section (hereafter in this subsection referred to as "serious injury") . . . and the commissioners voting are equally divided with respect to such determination, then the determination agreed upon by either group of commissioners may be considered by the President as the determination of the Commission."

Id. (emphasis added).

[10] Upon receiving a report from the Commission containing an affirmative injury determination, the President is directed to take all appropriate and feasible action within his power to facilitate efforts by the domestic industry to make a positive adjustment to import competition and provide greater economic and social benefits than costs. 19 U.S.C. § 2253(a)(1)(A).

mill industry in the form of an initial additional 30% tariff on tin mill imports.  See § 201

Proclamation at ¶ 9(b).  Corus argues that the affirmative votes of Commissioners Bragg and

Devaney should not have been counted towards the tin mill injury determination because neither

Commissioner specifically analyzed tin mill products.  Corus argues that the aggregation of

Commissioners Bragg and Devaney constitutes a "fundamental misconstruction of the Section

201 statute" employed by the ITC, accepted by the President, and carried out by Customs.  Corus

argues that, had the votes of Commissioners Bragg and Devaney been properly discarded with

respect to tin mill products, the Commission vote would have been 3-1 in the negative, thereby

precluding the imposition of § 201 tariffs on tin mill products.

Because the Act vests the President and ITC with "very broad discretion" and does not

specifically provide for judicial review, the court's review is extremely limited.  Maple Leaf Fish

Co., v. United States, 762 F.2d 86, 89 (Fed. Cir. 1985).

> In international trade controversies of this highly discretionary kind--involving the
> President and foreign affairs--this court and its predecessors have often reiterated the very
> limited role of reviewing courts. See, e.g., American Association of Exporters and
> Importers v. United States, 751 F.2d 1239, 1248-49 (Fed. Cir. 1985);  Florsheim Shoe
> Co. v. United States, 744 F.2d 787, 793, 795-97 (Fed. Cir. 1984).   For a court to
> interpose, there has to be a clear misconstruction of the governing statute, a significant
> procedural violation, or action outside delegated authority.

Id.  There is no statutory or regulatory provision enumerating how the Commission should count

its vote, and this manner of counting votes does not appear to conflict with the overall § 201

scheme.   The court, therefore, cannot find that there has been a clear misconstruction of the

statute or a significant procedural violation.

In the alternative, Corus asks the court to construe the absence of such a provision as a

limitation – i.e., that for the ITC to count its votes in this manner would be to act outside the

statutory authority granted by Congress. The Federal Circuit has already determined that Congress granted the ITC broad authority to reach its determination. "The same factors which have led, in this kind of discretionary case, to strict confinement of the court's intervention vis-a-vis the President are equally applicable to the ITC in its 'escape clause' functioning." Id. at 89-90. Under the statute, the Commission is required to render an injury determination and transmit that determination to the President. Congress imposed no qualifications upon the ITC's authority in this respect.

Moreover, it is clear that the Commissioners considered tin mill products in their analysis. Commissioner Bragg found as follows: "I determine that certain steel products are being imported in such increased quantities as to be a substantial cause of serious injury to the domestic industries producing: (1) carbon and alloy flat products (including slab, hot-rolled sheet and strip, corrosion resistant, grain oriented electrical steel, and tin mill products.)" Determination at 269 (separate views on injury of Commissioner Lynn M. Bragg). Commissioner Devaney defined the domestic industry "appl[ying] the same basic analysis as the majority. However, he finds a single like product consisting of all flat products." Determination at 36 n.65. Commissioner Devaney expressly stated that his findings should be applied to the more narrow categories determined by the majority. "Commissioner Devaney joins in the analysis of the majority, related to injury, as presented here. He further finds that if the analysis is performed over the entire industry as he has defined it, the result is the same, i.e., the industry is seriously injured." Determination at 52 n.186; see also Determination at 58 n.224 (same regarding causation). Thus, both commissioners made affirmative injury and causation findings with respect to tin mill products because, in their analyses, these products are included in the

larger category of carbon and alloy flat products.

The court finds that the Commission's method of counting votes is not a clear misconstruction of the governing statute, a significant procedural violation, or action outside the scope of the ITC's delegated authority.

**III. Preliminary Injunction**

Pursuant to USCIT R. 65(a), Corus seeks a preliminary injunction to enjoin Customs from collecting additional duties on its tin mill products or liquidating its entries. A preliminary injunction is an extraordinary remedy which may issue only upon a clear showing by the moving party that it is entitled to such relief. See Trent Tube Div., Crucible Materials Corp. v. United States, 14 CIT 587, 744 F. Supp. 1177 (1990). In order to obtain a preliminary injunction, Corus must demonstrate that: (1) without a preliminary injunction, Corus will suffer immediate irreparable harm; (2) there is likelihood of success on the merits; (3) the public interest would be better served by the requested relief; and (4) the balance of hardship on all the parties favors plaintiffs. See Zenith Radio Corp. v. United States, 710 F.2d 806, 809 (Fed. Cir. 1983).

In reviewing the factors, the court employs a "sliding scale." Chilean Nitrate Corp. v. United States, 11 CIT 538, 539 (1987). Consequently, the factors do not necessarily carry equal weight. FMC Corp. v. United States, 3 F.3d 424, 427 ("If a preliminary injunction is granted by the trial court, the weakness of the showing regarding one factor may be overborne by the strength of the others.... [Conversely], the absence of an adequate showing with regard to any one factor may be sufficient, given the weight or lack of it assigned the other factors, to justify [its] denial."). The crucial factor is irreparable injury. Elkem Metals Co. v. United States, 135 F. Supp. 2d 1324, 1329 (Ct. Int'l Trade 2001); Nat'l Hand Tool Corp. v. United States, 14 CIT 61,

65 (1990) ("[t]he critical question ... is whether denial of the requested relief will expose the applicant to irreparable harm."). "Failure of an applicant to bear its burden of persuasion on irreparable harm is ground to deny a preliminary injunction, and the court need not conclusively determine the other criteria." Bomont Indus. v. United States, 10 CIT 431, 437, 638 F.Supp. 1334, 1340 (1986); see also Chilean Nitrate Corp., 11 CIT at 539 (denying preliminary injunction solely on grounds that moving party failed to establish irreparable harm).

**A. Irreparable Harm**

**1. Collection**

Corus first argues that, without preliminary injunctive relief, it will be forced to close its Bergen, Norway plant. Generally, where a party is required to fundamentally alter its business operations during litigation in order to comply with a challenged Government action, that party suffers irreparable harm. See, e.g., CPC Int'l v. United States, 19 CIT 978, 979-81, 896 F. Supp. 1240, 1243-45 (1995); Am. Frozen Food Inst. v. United States, 18 CIT 565, 570, 855 F. Supp. 388, 393-94 (1994).

Corus contends that its Bergen, Norway plant is uniquely dependent upon U.S. tin mill sales revenues to meet its operating costs. Corus argues that it cannot absorb the additional safeguard duties for U.S. sales if it results in the Bergen plant operating at a loss.[11] Corus estimates that the projected losses for 2002 will be approximately [                    ]. Plaintiffs do not expressly attribute the entire loss to the impact of the safeguard provision but implies so by projecting that future litigation without a preliminary injunction will result in

---

[11] Corus argues that, because the U.S. tin mill market is subject to a "high degree of price sensitivity", Corus cannot raise the prices of its merchandise in the United States. Citing Affidavit of Jean-Paul Meijer (Financial Controller of Corus Packaging Plus Norway AS), ¶ 2.

similar losses in 2003 and 2004. Corus contends that the Bergen plant cannot be modified to produce other products. Corus argues that operating losses resulting from the safeguard provision will force it to permanently close the Bergen plant, costing 279 jobs. Corus argues that closing the Bergen the plant will have a significant and irreversible adverse impact upon its business operations.

There is no bright line test for determining irreparable harm. Defendants argue that mere economic injury is insufficient. See, e.g., Neenah Foundry Co. v. United States, 86 F. Supp. 2d 1308, 1313 (Ct. Int'l Trade 2000). Defendants point out that, in previous cases, Plaintiffs' burden has been met by parties demonstrating that they will go out of business in the absence of injunctive relief. Citing Queen's Flowers de Colombia v. United States, 20 CIT 1122, 125, 947 F. Supp. 503, 506 (Ct. Int'l Trade 1996); Am. Air Parcel Forwarding Co., v. United States, 4 CIT 94, 98 (1982). Contrary to Defendants' implication, there is no requirement that a party seeking injunctive relief establish imminent failure. Although Corus need not establish that it is on the verge of bankruptcy, Plaintiffs nevertheless bear an "extremely heavy burden." Shandong Huarong General Group Corp. v. United States, 122 F. Supp. 2d. 1367, 1369 (Ct. Int'l Trade 2000).

At oral argument, Corus presented two witnesses, Richard Maxwell, Finance Controller and Director of Corus Packaging Plus Norway AS ("CPP Norway"), and Stig Hauge, Managing Director, CPP Norway. Both testified as to the present standing of Corus, and CPP Norway in particular, after the implementation of § 201 tariffs. The crux of the testimony suggested that CPP Norway, a separate legal entity from the other Corus affiliates, could not independently

absorb the § 201 tariffs.[12]  Both witnesses testified that the Bergen plant is uniquely dependent upon U.S. sales revenues to meet its operating costs. Both testified that the Norway factory was not sufficiently profitable to attract investment for upgrades that might allow it to produce articles other than tin mill products.  Both witnesses testified that, as a result, the Bergen plant would have to raise prices or absorb the tariffs.  The witnesses testified that their customers had already indicated they would seek alternative suppliers should CPP Norway raise its prices.  The witnesses testified that CPP Norway has only a few customers and that a long-term separation would likely sever those business relationships.  The only alternative available, Corus argues, would be to absorb the tariffs.  The witnesses testified that CPP Norway would operate at a loss if it were forced to absorb the tariffs.  Corus argues that sound business principles would require it to close the plant rather than operate at a loss.  In short, although it has not made concrete plans to do so at any particular time, Corus argues that the effects of the § 201 safeguards will force it to close the Bergen, Norway plant.

Every increase in duty rate will necessarily have an adverse affect on foreign producers and importers.  That is particularly true with regards to the 30 % increase imposed under the safeguard provision.  If the court were to find irreparable harm under these facts, the court would likely be required to do so in any challenge to a duty increase because every plaintiff could argue that increased tariffs would cause revenue shortfalls possibly resulting in either operating at a loss or plant closure at some future date.  On balance, Corus has shown that it may suffer an

_____

   [12]  Corus America Inc. is the importing arm of Corus.  It actually pays the tariff and then charges that fee back to Corus.  It is unclear which affiliate is ultimately charged with paying the tariff, but for the purposes of this argument, the court assumes the cost is charged to CPP Norway.  Plaintiffs conceded at oral argument that they could show irreparable harm from duty collection only as to entries from CPP Norway, the owner of the Bergen plant.

adverse economic impact, but to find irreparable harm here would effectively create a per se irreparable harm rule in similar challenges – a result likely contrary to the extraordinary nature of the remedy. Am. Spring Wire Corp. v. United States, 7 CIT 2, 6, 578 F.Supp. 1405, 1408 (1984).

The court finds that Corus has not provided sufficient evidence that the Bergen plant is in danger of imminent closure. At best, Corus has suggested that CPP Norway cannot sustain the damage caused by § 201 tariffs over a long period of time. The court anticipates that it will issue its final decision on Counts II and III within a few months if not weeks. While Corus has arguably presented evidence of economic injury, that is insufficient. See S.J. Stiles Ass. v. Snyder, 646 F.2d 522, 525 (C.C.P.A. 1981) ("A preliminary injunction will not issue simply to prevent a mere possibility of injury, even where prospective injury is great."). Accordingly, there is little chance of irreparable harm in advance of a final court ruling.

**2. Liquidation**

Corus seeks to enjoin liquidation on grounds that, because neither the statute nor governing regulations authorize a reliquidation or refund, Corus will be denied effective and meaningful judicial review. Corus argues that, even if it succeeds on the merits, it will be unable to recover any excessive duties paid on entries in the past or interim and, therefore, will be irreparably harmed. Denial of effective and meaningful judicial review as a result of a court's refusal to grant a preliminary injunction can constitute irreparable harm. See Zenith Radio Corp. v. United States, 710 F.2d 806, 810 (Fed. Cir. 1983); NMB Sing. Ltd. v. United States, 120 F. Supp. 2d 1135, 1139-40 (Ct. Int'l Trade 2000).

According to counsel for the Administration, Customs normally liquidates entries on a

314-day cycle from the date of entry.  Def.s' Response to the Court's Inquiry Concerning

Liquidation of Entries Subject to the President's 201 Proclamation, at 2 (dated August 5, 2002).

A steel entry filed on March 20, 2002, the effective date of the § 201 remedy, would normally

liquidate on or about January 30, 2003.  Liquidation of a steel product entry covered by an

antidumping or countervailing duty order may take substantially longer because that entry is

automatically suspended until Customs receives liquidation instructions from the Department of

Commerce.  Plaintiffs allege that their entries are not currently suspended.  The court realizes

that there are no guarantees on when liquidation will occur, but, as discussed, the court intends to

resolve the matter quickly therefore harm from liquidation is not likely.  Moreover, the parties

have not explained why 28 U.S.C. § 1581(i) would not provide a post-liquidation remedy.[13]  The

absence of a statutory refund process would not seem to be a bar to relief as the court may

fashion equitable remedies.  Thus, liquidation also appears an unlikely cause of irreparable harm

here.

**B.  Public Interest**

Congress has expressly entrusted the issuance of safeguard measures to the President of

the United States.  Maple Leaf Fish Co., 762 F.2d at 89.  Revocation of a Presidential mandate

prior to a final determination that it violates the law would seem to be counter to the public

interest.  The public interest is also served by ensuring that government officials are appointed in

a constitutional manner and in accordance with Congressional intent, and that trade laws are

administered properly.  See, e.g., Ugine-Savoie Imphy v. United States, 121 F. Supp. 2d 684, 690

---

[13]  The parties seem to have focused on on 28 U.S.C. § 1581(a) which provides protest denial review of decisions of the Secretary of Treasury, not the President or ITC.

(Ct. Int'l Trade 2000). The court cannot reasonably quantify these interests for comparison separately from the likelihood of success on the merits and, instead, finds that this factor favors neither side.

### C. Balance of Hardship

Corus argues that the Government and domestic industry will suffer only negligible harm should a preliminary injunction be granted. That position is counter to the determinations at the core of this matter – that a tariff increase is necessary to counter-act serious injury or the threat of serious injury as determined by Commission and adopted by the President. Defendant-intervenors represent the domestic producers and present contrary affidavits and testimony stating that domestic industry presently suffers from both decreased domestic consumption of tin mill products and, at least prior to the § 201 relief, increasing market share of low-priced subject imports. Defendant-intervenors argue that a preliminary injunction would effectively revoke the § 201 increases causing low-priced imports to flood the market. Defendant intervenor's evidence was weak on the causal relationship between imports and injury, but the Commission's affirmative injury determination itself would appear to be some support for the domestic industry's hardship claim.[14] Further, defendant-intervenors provided some evidence that imposition of the § 201 relief has provided opportunities to improve their liquidity, which could be lost if § 201 duties were not collected.

Corus too has submitted some evidence of hardship. See discussion supra § III, A, 1. While the economic injury suffered by Corus under the § 201 safeguard provisions may be

---

[14] The court has not been asked to review the Commission's determination for this purpose, and has not done so.

insufficient to establish the requisite irreparable harm, the court finds it persuasive to support

hardship.  On balance, the court finds that both parties likely have shown some hardship and

cannot conclude at this point that injury suffered by one in the absence of § 201 safeguards

outweighs injury suffered by the other in their presence.

### D.  Likelihood of Success on Merits

As discussed, supra § III, the court analyzes the four preliminary injunction factors on a

sliding scale.  Because Corus makes, at best, a weak showing of irreparable harm and does not

prevail on either balance of hardship or public policy grounds, Corus must make a heightened

showing that it is likely to succeed on the merits.  As discussed, supra § II, the court finds that the

ITC did not act contrary to law in counting the votes of individual Commissioners.

Consequently, Corus must demonstrate that it is very likely to succeed on the merits of Counts II

and III.[15]  Both counts attack the validity of Commissioner Devaney's appointment and his

consequent vote on the § 201 safeguards.[16]

### 1.  Count II: Vacancy

Corus first argues that, at the time of Devaney's appointment, there was not a vacancy to

---

[15]  Briefing and argument is not complete on these two counts.

[16]  Defendants argue that Counts II and III should be dismissed because Corus did not raise appointment issues before the ITC and, therefore, did not exhaust its administrative remedies.  Corus argues that the Commission was aware of the questions surrounding Commissioner Devaney's appointment and to raise them would be futile.  In addition, Defendants argue that, even if Commissioner Devaney's appointment was technically flawed, his actions were authorized by the de facto officer doctrine.  See Ryder v. United States, 515 U.S. 171, 180 (1995) ("The de facto officer doctrine confers validity upon acts performed by a person acting under the color of official title even though it is later discovered that the legality of that person's appointment or election to office is deficient.").  For the purposes of ruling on the preliminary injunction, the court assumes that Plaintiffs' claim would survive these particular challenges.

be filled.  The term of Commissioner Devaney's predecessor, Thelma J. Askey, ended on

December 16, 2000.  She maintained her position pursuant to 19 U.S.C. § 1330(b)(2) (2000),

which authorizes a departing Commissioner to remain in office as a "holdover" "until his

successor is appointed and qualified."  Corus argues that, because Commissioner Askey had

neither resigned nor been removed prior to Commissioner Devaney's putative appointment on

January 3, 2001, no vacancy existed on that date for the President to "fill" by recess appointment.

Citing Wilkinson v. Legal Services Corp. , 865 F.Supp. 891, 900-01 (D.D.C. 1994), rev'd on

other grounds, 80 F.3d 535 (D.C. Cir. 1996) (construing the Legal Services Corporation Act of

1974, codified at 42 U.S.C. § 2996b, to read that a vacancy does not occur upon the expiration of

a term of office but only upon the resignation, death, or removal of a sitting officer); Mackie v.

Clinton, 827 F. Supp. 56 (D.D.C. 1993), vacated as moot, 1994 WL 163761 (D.C. Cir. Mar. 9

1994) (construing the appointment provision of the Postal Reorganization Act of 1970, as

codified in 39 U.S.C. § 202(b), to read the same).

       Defendants argue that the Act establishes that the end of one Commissioner's term

necessarily creates a "vacancy."  Section 330(b) of the Act, provides that:

> The term of office of each commissioner appointed after such date shall expire 9 years
> from the date of the expiration of the term for which his predecessor was appointed,
> except that--
> . . .
> (2) any commissioner may continue to serve as a commissioner after an expiration of his
> term of office until his successor is appointed and qualified.

19 U.S.C. § 1330(b)(2) (emphasis added).  Defendants cite Staebler v. Carter for the proposition

that similar statutory language has been construed to recognize the creation of a vacancy at the

time a Commissioner's term expires.  464 F. Supp. 585, 588-90 (D.D.C. 1979) (construing the

appointment provision of the Federal Election Campaign Act, as codified in 2 U.S.C. §

437c(a)(2)(B) to read that a vacancy is created upon the expiration of the predecessor's term).

In the primary cases relied upon by the parties, Staebler, Wilkinson, and Mackie, the district courts struggled with the vacancy issue. The courts recognized that there was little guidance to determine when a vacancy is created. In each case, the court ultimately resorted to a construction of the governing statute. The parties here ask the court to engage in similar statutory construction with respect to the "appointed and qualified" language of the holdover provision. The parties debate whether Commissioner Askey's holdover position terminated upon Devaney's appointment, thus creating a vacancy. In Swan v. Clinton, 100 F.3d 973 (D.C. Cir. 1996), the only circuit case on point, the court found that "a more natural reading of 'qualified' [for purposes of similar language in the National Credit Union Administration Act] mean[s] that the requirements for assuming office have been fulfilled, which could be either by nomination with Senate confirmation or by recess appointment." Id. at 986 (emphasis added). Swan is not binding and may be distinguishable, but it certainly does not assist Plaintiffs. At best, Plaintiffs can establish that the question of whether a vacancy exists under § 1330 is open.[17] As such, Plaintiffs cannot establish that it is very likely to succeed to on this issue.

### 2. Count III: Recess Appointment

The President is constitutionally empowered "to fill up all Vacancies that may happen during the Recess of the Senate, by granting Commissions which shall expire at the End of their next Session." U.S. Const. art. II, § 2, cl. 3. Under the recess appointment clause, the President

---

[17] The court notes that the issue of whether a vacancy existed at the time of Commissioner Devaney's appointment is presently under review for final, not preliminary, resolution in Nippon Steel Corp. v. United States, Court No. 01-00103 (Ct. Int'l Trade) (J. Eaton) ("Nippon 01-00103").

may appoint officers without the normally requisite advice and consent of the Senate. U.S. Const. art. II, § 2, cl. 2. On December 15, 2000, the Senate and House adjourned sine die. On December 16, 2000, Commissioner Askey's term as Commissioner of the ITC expired. On the morning of January 3, 2001, a recess appointment order was prepared and executed by the White House Executive Clerk's office appointing Mr. Devaney as a Commissioner to the ITC. The Senate reconvened at 12:01 p.m. on the same day. It is important to note that Plaintiffs did not object to Defendants' statement of material fact that the order was executed before the Senate reconvened and, therefore effectively conceded that the appointment, in the ordinary sense of the word, was made during a recess.[18]

Corus challenges the sufficiency of Commissioner Devaney's appointment arguing that the appointment is not valid for the purposes of the recess appointment clause until the President signs a "commission," which did not occur until after the Senate reconvened.[19] Plaintiffs cite Marbury v. Madison, 5 U.S. 137, 157 (1803), for the proposition that, until the President's "last act" is complete – i.e. the signature, the appointment is incomplete. While Marbury describes the commission as "conclusive evidence" of the appointment, id. at 157, it is not clear that the commission is the only sufficient evidence. The court finds that Plaintiffs have not shown that they are highly likely to prevail on this issue.

---

[18] This concession may create a factual scenario significantly different than that in Nippon 01-00103.

[19] Commissioner Devaney took the oath of office on January 16, 2001. The Commission was signed on January 18, 2001.

## CONCLUSION

Because Plaintiffs' challenge to the imposition of a tariff underlies its argument as to the status of a Commissioner, the court has jurisdiction pursuant to 28 U.S.C. § 1581(i).  The ITC's Motion to Dismiss on jurisdictional grounds is denied.   With respect to the ITC's aggregation of votes, the court does not find a clear misconstruction of the governing statute. As in Maple Leaf Fishing Co., it is enough for this case that the ITC made the ultimate injury determination in a manner that does not violate any statutory provision.  762 F.2d at 90.  Moreover, the court finds that Congress delegated broad authority to the President and Commission under § 201 and, therefore, the Commission did not act outside its authority in presenting its determination as "equally divided".  Defendants' Motion for Summary Judgment is granted as to Count I.  As for the preliminary injunction, Plaintiffs' weak showing of imminent irreparable harm and questionable showing of likelihood of success on the merits are insufficient to justify preliminary injunction.  Plaintiffs' motion for a preliminary injunction is DENIED.


_____
Jane A. Restani
JUDGE


Dated:  New York, New York

This 9th day of August, 2002.